Edward Lee CLEMMONS,
Plaintiff–Appellant,

v.

Dale BOHANNON, Robert Tansy, Herb Maschner, and Robert Mills,
Defendants–Appellees.

No. 88–2730.

United States Court of Appeals,
Tenth Circuit.

Oct. 9, 1990.

Rehearing and Rehearing En Banc
Granted Nov. 14, 1990.

Edward Lee Clemmons, pro se.

Robert T. Stephan, Atty. Gen. (Carol R. Bonebrake, Asst. Atty. Gen., with him on the brief), Topeka, Kan., for defendants-appellees.

Before McKAY, SEYMOUR, and TACHA, Circuit Judges.

SEYMOUR, Circuit Judge.

Pro se plaintiff Edward Lee Clemmons, an inmate at the Kansas State Penitentiary, sued officials of the Kansas Department of Corrections under 42 U.S.C. § 1983 (1982), alleging violations of the Eighth and Fourteenth Amendments arising out of his involuntary subjection to environmental tobacco smoke. He also contends that defendants imposed disciplinary segregation in retaliation for asserting his alleged rights. The district court granted summary judgment for defendants, and Clemmons appeals. We reverse, concluding that defendants' policy of permitting the indefinite double-celling of smokers with nonsmokers against their expressed will can amount to deliberate indifference to the health of nonsmoking inmates in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.[1] We remand these claims for further consideration. We otherwise affirm the district court's grant of summary judgment.[2]

I.

Clemmons is a Muslim inmate at the Kansas State Penitentiary in Lansing, Kansas. He has been double-celled with another inmate in a cell originally designed for one prisoner, apparently since his admission to the penitentiary, due to overcrowding in existing prison facilities. Although Clemmons is a nonsmoker for both religious and health reasons, he has been forced to share a cell with smoking inmates at the discretion of the Department of Corrections. Clemmons contends that his subjection to smoking cellmates in a sixty-three square foot cell has led to significant involuntary exposure to "passive," "secondary," or "environmental tobacco smoke" (ETS), amounting to deliberate indifference to his health in violation of the Eighth Amendment, and of his Fourteenth Amendment right to substantive due process.

In response to Clemmons' complaint, the district court ordered defendants to prepare a *Martinez* report. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir.1978) (en banc) (per curiam). Defendants did so, attaching doctors' examination reports showing no symptoms of shortness of breath or pneumonia after Clemmons' complaints of irritation due to cigarette smoke. Defendants then filed a motion for summary judgment. Clemmons' response to the motion included affidavits from smoking and nonsmoking prisoners, as well as exhibits showing his various requests for nonsmoking cellmates, defendants' responses to his requests, and documentation of the health hazards of ETS. The district court granted defendants' motion for summary judgment, concluding that Clemmons had failed to raise a cognizable claim. The court held that Clemmons' involuntary exposure to ETS resulting from double-celling a nonsmoker with a smoker was a mere "inconvenience" with no constitutional signifi-

---

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R. App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.

2. Clemmons raised a First Amendment claim below which he does not reassert on appeal. Consequently, we will not consider it here. *See United States v. Spector*, 343 U.S. 169, 172, 72 S.Ct. 591, 593, 96 L.Ed. 863 (1952).

cance. The court also granted Eleventh Amendment immunity from Clemmons' requests for compensatory and punitive damages to all defendants in their official capacities, and granted them qualified immunity in their individual capacities. Finally, the court dismissed Clemmons' claim of retaliation as frivolous. On appeal, Clemmons contends that the district court erred in dismissing his Eighth Amendment, Fourteenth Amendment, and retaliation claims, but he does not urge as error the district court's conclusion that defendants are immune from liability for damages.

## II.

When reviewing a grant of summary judgment, we must determine whether any genuine issue of material fact pertinent to the ruling remains and, if not, whether the substantive law was correctly applied. *See Franks v. Nimmo*, 796 F.2d 1230, 1235 (10th Cir.1986). In deciding the constitutional claims in this case, the district court appears to have accepted the facts as shown in Clemmons' exhibits and affidavits, concluding that Clemmons raised no fact issues pertinent to a constitutional claim. In reviewing this decision, we must construe all pleadings and documentary evidence liberally in favor of the party opposing the motion. *Id.* This standard is particularly apt when the nonmoving party is a pro se prisoner. *See Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (pro se complaint "can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'") (citations omitted); *see also Meade v. Grubbs*, 841 F.2d 1512, 1526 (10th Cir. 1988). We then review de novo the questions of law presented by the facts so construed.

When viewed in this light, the record shows that Clemmons alleged that ETS is "harmful" and "hazardous to health." *Memorandum in Support of Plaintiff's Motion*, rec., vol. I, doc. 22, at 4; *id.* at ex. 4 (letter from Clemmons to Herb Maschner dated May 7, 1987). Clemmons also some-

what awkwardly attempted to produce evidence that ETS is a positive health hazard. *See id.* at ex. 6 (flyer from American Lung Association of Kansas and newspaper article concerning danger of cancer from secondhand smoke); *see also id.* ex. 5 at 3 (letters from prison physician and his assistant recommending that Clemmons "should reside in a cell with a nonsmoker, if possible").

Despite Clemmons' repeated complaints about his confinement in a small cell with a smoker, defendants have made no sustained effort to find him a nonsmoking cellmate. Although Clemmons has sometimes been celled with nonsmokers, these arrangements appear to have been of short duration. Defendants do not dispute that the vast majority of Clemmons' cellmates have been regular smokers. Further, it is undisputed that Clemmons could be forced to cell with a smoker indefinitely, in the discretion of the Department of Corrections, for no stated reason.

Clemmons, in a multitude of written requests and letters to corrections officials, has repeatedly requested either a single cell or a nonsmoking cellmate. His single-cell requests were denied because of lack of space. The responses to his requests for a nonsmoking cellmate were more varied. On one occasion, his request was approved but he was thereafter assigned with a smoker. On other occasions, he was told his request would "be considered." *See* rec., vol. I, doc. 22, ex. 4, at 1. In response to yet other requests, he was told that since prison officials had "no way of knowing who smokes or doesn't," *id.* at 7, he should "find a nonsmoker and let [them] know," *see id.* at 4. On some occasions, Clemmons would reply that he was unable to find such a person, while at other times he would submit a list of nonsmoking inmates. Neither reply appears to have made a difference.

When Clemmons asked at one point to remain cellmates with a nonsmoker because they "desire[d] to protect [their] health from exposure to tobacco smoke in [their] cell breathing space where [they] live," *id.* at 9, his request was denied for

unexplained reasons. *Id.* Clemmons attached the letters cited above from the prison physician and from his assistant to yet another written request for a nonsmoking cellmate. He was told that if he found an "appropriate" nonsmoker, they could be moved together. The upshot of this exchange is not evident in the record.

Defendants' position below and on appeal is that the prison's treatment of Clemmons did not constitute deliberate indifference within the meaning of the Eighth Amendment, nor a violation of the Fourteenth Amendment. Defendants continue to maintain that Clemmons' retaliation claim is frivolous.

### III.

#### A. The Eighth Amendment Claim

■ The applicable modern Eighth Amendment principles are now familiar. The Cruel and Unusual Punishments Clause proscribes punishments "which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain'; or are grossly disproportionate to the severity of the crime. Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (citations omitted). A prisoner's conditions of confinement may constitute punishment prohibited by the Eighth Amendment unless such conditions are "'part of the penalty that criminal offenders pay for their offenses against society.'" *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399). Any Eighth Amendment analysis of whether prison conditions are cruel and unusual punishment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion); *see also Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 2691, 101 L.Ed.2d 702 (1988) (plurality opinion); *Penry v. Lynaugh,* — U.S. —, 109 S.Ct. 2934, 2953, 106 L.Ed.2d 256 (1989). To avoid the imposition of a judge's subjective views, these evolving standards of decency must be informed by "objective factors to the maximum possible extent." *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399 (citation omitted). We are also mindful that judicial responses to conditions of confinement claims must spring from constitutional requirements "'rather than a court's idea of how best to operate a detention facility.'" *Id.* at 351, 101 S.Ct. at 2401 (quoting *Bell v. Wolfish,* 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979)).

Applying these principles to particular cases involves self-restraint. This reticence to interfere in prison administration is tempered by the recognition that "judicial intervention is *indispensable* if constitutional dictates—not to mention considerations of basic humanity—are to be observed in the prisons." *Id.* 452 U.S. at 354, 101 S.Ct. at 2403 (Brennan, J., concurring); *see also Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) ("a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims"); *Battle v. Anderson,* 564 F.2d 388, 392 (10th Cir.1977) (same). In attempting to maintain this balance in particular cases, we first look to the principles already well established in the Supreme Court and lower court cases in the conditions-of-confinement area.

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court first held that prison officials' deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment. In *Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978), the Court affirmed a district court's holding that denial of an inmate's basic human needs is "cruel and unusual." These decisions arise from an essential fact of prison life: the prisoner depends totally on the state to secure those necessities fundamental to his or her very existence. An incarcerated person loses more than freedom. The prisoner must depend on the state to make the most basic

decisions vital to his or her health and safety. The Eighth Amendment, as now construed, requires that the state act humanely in making these decisions on its wards' behalf. *See Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (" '[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself' ") (quoting *Spicer v. Williamson,* 191 N.C. 487, 490, 132 S.E. 291 (1926)). *See also Battle,* 564 F.2d at 395 ("Persons are sent to prison as punishment, not *for* punishment").

■ Courts have applied this general principle in a variety of situations relating to the maintenance of an inmate's physical well being. *See, e.g., Caldwell v. Miller,* 790 F.2d 589, 600 (7th Cir.1986) (prolonged restriction on exercise that threatens an inmate's physical health); *Hoptowit v. Spellman,* 753 F.2d 779, 783–84 (9th Cir. 1985) (lack of adequate ventilation and air flow, inadequate cell-cleaning supplies, vermin infestation, poor lighting); *Jones v. Diamond,* 636 F.2d 1364, 1374 (5th Cir.) (en banc) (gross overcrowding, filthy mattresses, extreme heat, poor diet, lack of exercise), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981), *overruled in part on other grounds, International Woodworkers v. Champion Int'l Corp.,* 790 F.2d 1174, 1175 (5th Cir.1986); *Ruiz v. Estelle,* 679 F.2d 1115, 1152 (5th Cir.1982) (inadequate regular exercise), *vacated in part on other grounds,* 688 F.2d 266, *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Spain v. Procunier,* 600 F.2d 189, 199–200 (9th Cir.1979) (denial of regular outdoor exercise for period of years); *Miller v. Carson,* 563 F.2d 741, 751 n. 12 (5th Cir.1977) (deprivation of exercise). These decisions all reflect the same well-settled principle: the state is under a constitutional mandate to take reasonable steps to provide a safe and sanitary environment for those incarcerated. *See generally* J. Gobert & N. Cohen, *Rights of Prisoners* §§ 11.10, 11.14–.15, 11.17 (1981 & 1989 Cum.Supp); *cf. Ramos v. Lamm,* 639 F.2d 559, 568 (10th Cir.1980) (state must provide inmate with a " 'healthy habilitative environment' ") (quoting *Battle,* 564

F.2d at 395), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

■ Although an issue of first impression in this circuit, courts elsewhere have been divided on whether involuntary exposure to ETS in one's cell implicates this same principle. In *Avery v. Powell,* 695 F.Supp. 632, 639–40 (D.N.H.1988), the district court held that it was possible for a prisoner to state an Eighth Amendment claim by showing that constant involuntary exposure to ETS endangered his physical health. The court cited the 1986 Surgeon General's Report and echoed that report's conclusion that "involuntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers," and that "the simple separation of smokers and nonsmokers within the same air space may reduce, but does not eliminate, the exposure of nonsmokers to environmental tobacco smoke." *Id.* at 637–38; *see also* 1986 Surgeon General Report, "The Health Consequences of Involuntary Smoking," U.S. Dep't of Health and Human Services, Public Health Service (1986) (hereinafter "1986 Report"). The court also referred to federal regulations and laws in forty-five states and the District of Columbia, a significant portion of which regulated tobacco use to restrict exposure to ETS. *Avery,* 695 F.Supp. at 640. The court went on to "extrapolat[e] from legislative enactments a finding that the exposure to ETS violates society's standards of decency," and concluded that "those objective factors, buttressed by significant scientific authority, indicate that tobacco smoke may be a harmful and possibly lethal indoor pollutant." *Id.*

In *Gorman v. Moody,* 710 F.Supp. 1256 (N.D. Ind.1989), another district court held that exposure to ETS does not implicate the Eighth Amendment because "society cannot yet *completely* agree on the propriety of nonsmoking areas." *Id.* at 1262 (emphasis added). Significantly, the plaintiff there had been released from prison in early 1985, and was thus limited to damages occurring prior to that time. We do not disagree with the outcome in *Gorman* because the Surgeon General did not issue his report on the hazards of ETS until 1986.

The court took care to note that "the effects of second-hand smoke have just recently become known.... [T]here may come a time when the 'evolving standards of decency that mark the progress of society' demand a smoke-free environment in a prison setting." *Id.*

The Fifth Circuit in *Wilson v. Lynaugh,* 878 F.2d 846 (5th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 417, 107 L.Ed.2d 382 (1989), affirmed a district court's denial of leave to proceed *in forma pauperis* in a prisoner suit alleging that exposure to ETS violates the Eighth Amendment. *See* 28 U.S.C. § 1915(d) (1982). The prisoner in *Wilson* had filed a similar suit in 1980, and the district court had ruled against him on a summary judgment motion. In holding that the application of res judicata rendered the prisoner's suit duplicative, the court concluded that the recent discoveries of the harmful effects of ETS in the 1986 Surgeon General's report were not " 'significant facts creating new legal conditions' " which would allow relitigation of the claim. *Wilson,* 878 F.2d at 851 (citation omitted). The court emphasized that its decision affirming the section 1915(d) dismissal was not on the merits and that it "should not be construed as foreclosing in perpetuity the ability of prisoners ... to litigate their ETS claims." *Id.* at 851–52.

Finally, the court in *Caldwell v. Quinlan,* 729 F.Supp. 4, 6 (D.D.C.1990), stated that "contemporary society has yet to view exposure to secondhand smoke as transgressing its 'broad and idealistic concepts of dignity, civilized standards, humanity and decency.' " 729 F.Supp. at 6 (quoting *Estelle,* 429 U.S. at 102, 97 S.Ct. at 290). However, in that case the prison had established a nonsmoking/smoking policy in an effort to accommodate both smoking and nonsmoking prisoners. Certain common areas were designated nonsmoking, the dining hall had a nonsmoking area, prisoners determined whether offices and other work areas would be smoking or nonsmoking, and two of the prison's housing units were designated as nonsmoking. The plaintiff complained that smoke was drifting over to his cell from nearby smoking cells, and that he was being exposed to passive smoke while he was transported among various prison facilities. It was in that context that the court said it could "not find that the Director's failure to *constantly* segregate smokers from nonsmokers constitutes 'cruel and unusual punishment' and it certainly cannot find that plaintiff's occasional exposure to smoke drifting over from designated 'smoking' areas violates the Eighth Amendment." *Id.* at 6–7 (emphasis added).

The dispute among these courts has centered on the necessary extent of public recognition that long-term exposure to ETS in close quarters is potentially damaging to one's health, and how much this recognition must percolate throughout our social institutions and become manifest in legislative enactments before a court may invoke the "evolving standards of decency that mark the progress of a maturing society." *Trop,* 356 U.S. at 101, 78 S.Ct. at 598. We believe this type of inquiry is unnecessary. The extensive line of cases recognizing a prisoner's constitutional right to a "healthy habilitative environment," *Ramos,* 639 F.2d at 570, reflects a longstanding judicial recognition that exposing a prisoner to an unreasonable risk of a debilitating or terminal disease does indeed offend these "evolving standards of decency."

It is the precise circumstance creating the unreasonable risk which resists definition, as borne out by the variety of factual circumstances which courts have concluded can amount to an unreasonable risk to a prisoner's health. *See* cases cited *supra,* at 862–63; *see also Martin v. Sargent,* 780 F.2d 1334, 1338 (8th Cir.1985) (inadequate diet, unsanitary physical conditions, denial of personal hygiene items and lack of opportunity to exercise); *Ramos,* 639 F.2d at 567–72 (extremely small cell size, inadequate ventilation, unsanitary kitchen conditions); *Campbell v. Cauthron,* 623 F.2d 503, 507–09 (8th Cir.1980) (lack of exercise and inadequate diet); *Riddick v. Bass,* 586 F.Supp. 881, 883 (E.D.Va.1984) (denial of low sodium diet); *Laaman v. Helgemoe,* 437 F.Supp. 269, 323 (D.N.H.

1977) (unsanitary kitchen facilities);[3] *see generally* Gobert & Cohen, *Rights of Prisoners* §§ 11.10, 11.14–.15, 11.17 (and cases cited therein). Moreover, as scientific awareness of potential harms evolves, some risks previously thought innocuous may rise to constitutional significance, while other risks, previously thought unacceptable, may no longer require judicial intervention. The constitutional standard—unreasonable risks to health—remains relatively constant, while the types of risks implicating the standard may change as our medical and scientific knowledge evolves.

The relevant question in this case, therefore, is whether long-term exposure to ETS poses an unreasonable risk of harm to an inmate's health. It is not our task on appeal to answer what is in large part a factual question. Rather, we are asked only to review the correctness of the district court's conclusion that it is *beyond doubt* that Clemmons can prove no set of facts in support of his claim which would entitle him to relief. *See* rec., vol. I, doc. 23, at 5; *see also Estelle*, 429 U.S. at 106, 97 S.Ct. at 292. The district court concluded, in spite of evidence of the Surgeon General's 1986 Report,[4] that such exposure was a mere "inconvenience." Rec., vol. I, doc. 23, at 4. We cannot agree that the record below, as supplemented by evidence of which we have taken judicial notice,[5] justified this factual conclusion under the *Estelle* standard and Fed.R.Civ.P. 56(c). To the contrary, the mounting scientific evidence of the potentially lethal effects of long-term exposure to tobacco smoke,[6] raises a genuine fact issue whether the type of exposure potentially faced by a nonsmoking prisoner double-celled with a smoker constitutes a health hazard at least as significant as denial of exercise. *See, e.g., Spain v. Procunier*, 600 F.2d at 199–200. As the Surgeon General has emphasized:

"[T]he time for delay is past; measures to protect the public health are required now. The scientific case against involuntary smoking as a health risk is *more than sufficient* to justify appropriate remedial action, and the goal of any remedial action must be to protect the nonsmoker from environmental tobacco smoke."

1986 Report at xii (emphasis added).

Hesitation in recognizing the health hazards of ETS would not comport with the

**3.** Significantly, none of the cases cited above concerning unreasonable risks to health embarked on an analysis of the extent to which the specific risk at issue had been recognized as such by the public. Why the specific risk presented by exposure to ETS should be treated differently escapes us.

**4.** *See* rec., vol. I, doc. 22, pl. ex. 6, at 2, where references were made to the Surgeon General's studies concerning exposure to ETS.

**5.** *See* Fed.R.Evid. 201 (court may take judicial notice of adjudicative facts in absence of request of party at any stage of the proceeding). In this case, for purposes of determining whether Clemmons raises fact issues sufficient to survive summary judgment, we have taken judicial notice of federal statutes and regulations, state statutes, government reports, municipal ordinances, and the Surgeon General's reports referred to or incorporated into the Congressional Record. Although much of this information was not noticed by the district court, appellate courts may notice facts not noticed below. *See* Advisory Committee's Notes to Fed.R.Evid. 201(f); *Melton v. Oklahoma City*, 879 F.2d 706, 724 (10th Cir.1989) (judicial notice taken by appellate court of city charter) *reh'g granted on other grounds*, 888 F.2d 724 (1989); *Mills v. Denver Tramway Corp.*, 155 F.2d 808, 812 (10th Cir.1946) (appellate court has discretion to take judicial notice of facts not called to the attention of the trial court); E. Cleary, *McCormick on Evidence* § 333 (3d ed. 1984). We may take notice of declarations in federal statutes, *see United States v. Van Buren*, 513 F.2d 1327, 1328 (10th Cir.), *cert. denied*, 421 U.S. 1002, 95 S.Ct. 2402, 44 L.Ed.2d 670 (1975); state statutes, *see United States v. One (1) 1975 Thunderbird*, 576 F.2d 834, 836 (10th Cir.1978); municipal ordinances, *see Melton*, 879 F.2d at 724 n. 25; official government publications, *see Clappier v. Flynn*, 605 F.2d 519, 535 (10th Cir.1979); and agency rules and regulations, *see Ray v. Aztec Well Serv. Co.*, 748 F.2d 888, 889 (10th Cir.1984).

**6.** The most comprehensive source of scientific evidence concerning the harmful effects of ETS is the 1986 Report. A later Surgeon General's report in 1988 determined that nicotine, the principal pharmacological agent in tobacco smoke, is a powerfully addicting drug. *See U.S. Dep't of Health, Educ. & Human Servs., The Health Consequences of Smoking Nicotine Addiction, A Report of the Surgeon General* at iv (1988).

Eighth Amendment standard set forth by the Supreme Court in *Trop*, or with our decisions in *Ramos* and *Battle* mandating judicial action when an inmate's right to a "healthy habilitative environment" is violated.[7] No one can seriously dispute that our society as a whole ceased decades ago to tolerate prison conditions threatening the health and safety of inmates. The cases cited above applying and enforcing this principle in manifold factual contexts speak for themselves.

The dissent interprets the Supreme Court's decision in *Rhodes* to proscribe as unconstitutional only those health hazards which already have resulted in injury or adverse symptoms, apparently regardless of how severe the potential harm may be or how imminent the danger from exposure to the risk. *See* Dissent at 871. The dissent points to nothing in *Rhodes* to support its narrow, rigid, and somewhat draconian interpretation of that case. The majority opinion in *Rhodes* does not even intimate that an Eighth Amendment plaintiff is required to allege that the unreasonable risk to health complained of has actually come to fruition before a court may intervene. If anything, the Court's analysis points in the opposite direction. The facts in *Rhodes* disclosed that the prisoners had air conditioning and radios in their cells, and had open access from 5:30 a.m. to 9:30 p.m. to dayrooms with television and card tables which the district court had described as " 'in a sense part of the cells and ... designed to furnish that type of recreation or occupation which an ordinary citizen would seek in his living room or den.' " 452 U.S. at 341, 101 S.Ct. at 2396. Those prisoners not on restriction, or about 75% of the total, could choose to spend most of the day outside their cells in school, the work-

shop, the library, at meals, or in the dayroom. *Id.* It was on these facts that the Court held double-celling to be constitutional. The majority emphasized that "[t]he double celling made necessary by the unanticipated increase in prison population did not lead to deprivations of essential food, medical care, or sanitation." *Id.* at 348, 101 S.Ct. at 2400. Had the majority adopted the approach suggested by the dissent, it more appropriately would have stated that double celling did not result in inmate starvation, death or severe injury from lack of medical care, or infection and illness from unsanitary conditions. The Court purposely left the applicable standard broadly worded, *see* supra at 862, precisely because the types of punishments potentially violative of the Eighth Amendment admit no definitive categorization. We do not believe *Rhodes* requires prisoners to be diagnosed with cancer before their rights become ripe under the Eighth Amendment.

In addition to the scientific evidence that tends to establish the significant health threat of ETS exposure, there has been increasing recognition outside the scientific community of the hazards of tobacco smoke. For example, as of 1987, forty-six states and the District of Columbia had passed legislation restricting smoking to protect nonsmokers from even *voluntary* exposure to ETS. *See* Note, *An Overview of Current Tobacco Litigation and Legislation*, 8 U.Bridgeport L.Rev. 133, 172 & 175–82 (Appendix A) (1987). An example of such legislation is a Kansas statute that forbids smoking in public places or in public meetings, except in designated smoking areas. Kan.Stat.Ann. §§ 21–4009 to 21–4010 (1988). The statute explicitly recog-

---

**7.** If the Eighth Amendment demands that courts not hesitate to recognize health hazards, it also requires that we not hesitate to recognize situations in which severe latent harm is a likely result of an ignored prison condition. The court in *Gorman v. Moody*, 710 F.Supp. 1256, 1262 (N.D.Ind.1989), for example, distinguished *Franklin v. Oregon, State Welfare Div.*, 662 F.2d 1337, 1347 (9th Cir.1981), where the court held that a prisoner plaintiff stated an Eighth Amendment claim arising out of exposure to ETS. In *Franklin*, the plaintiff alleged that the

smoke exacerbated his throat tumor. The *Gorman* court emphasized that the existence of a "previously diagnosed serious medical condition" set the *Franklin* case apart. *Gorman*, 710 F.Supp. at 1262.

While we agree with *Gorman* that the plaintiff in *Franklin* had a more urgent need for safe air, we nevertheless believe the Constitution does not require waiting until the prisoner actually develops a serious medical condition—be it lung cancer or another disease—before affording relief from exposure to a known carcinogen.

nizes the interest of nonsmokers in avoiding the toxic effects of ETS:

> "Where smoking areas are designated, existing physical barriers and ventilation systems should be used to *minimize the toxic effect of smoke in adjacent nonsmoking areas.*"

*Id.* § 21–4010(c) (emphasis added). ·

The New Mexico State Legislature similarly acknowledged the health hazards of ETS in enacting the Clean Indoor Air Act:

> "The Legislature finds and decrees that the smoking of tobacco ... *is a positive danger to health and a health hazard to those who are present in enclosed places....*"

N.M.Stat.Ann. § 24–16–2 (1985) (emphasis added). Many other states have made explicit their awareness and concern for the health of nonsmokers subjected to ETS.[8]

Congress and federal agencies[9] also have responded to the recent scientific recognition that ETS exposure may pose a substantial health hazard. For example, Congress recently amended a statute temporarily banning smoking on airline flights of two hours or less to impose a permanent prohibition against smoking on all domestic airline flights in the contiguous United States regardless of duration, and a ban on all flights of six hours or less when to or from Alaska or Hawaii. *See* Department of Transportation and Related Agencies Appropriations Act, 1990, Pub.L. No. 101–164, Tit. III, § 335, 103 Stat. 1069, 1098–99 (1989) (codified as amended at 49 U.S.C.A.

---

**8.** State legislation enacted in response to the health hazards of ETS is widespread. California, for example, eliminated smoking on public transportation vehicles, *see* Cal.Health & Safety Code § 25948 (West Supp.1990), in direct response to the 1986 Surgeon General's report. After concluding that exposure to ETS is a positive health hazard, the legislature declared that "[n]onsmokers have no adequate means to protect themselves from the damage inflicted upon them when they involuntarily inhale tobacco smoke." *Id.* at § 25948(b)(1) *See also* Cal. Health & Safety Code § 25940.5 (West 1984) ("The Legislature finds and declares that tobacco smoke is a hazard to the health of the general public.").

Maine limits smoking in shopping centers to designated areas "[i]n order to protect the public from detrimental effects of smoking by others" Me.Rev.Stat.Ann. tit. 22, § 1672–A(1) (1989 Supp.). Arizona has declared that "[s]moking tobacco in any form is ... dangerous to public health if done in any ... [e]levator, indoor theater, [or other enclosed places]. Ariz.Rev. Stat.Ann. § 36–601.01 (1986). New Jersey prohibits smoking in various enclosed areas in recognition of the fact that tobacco smoke is "at least an annoyance and a nuisance to a substantial percentage of the nonsmoking public, and ... a substantial health hazard to a smaller segment of the nonsmoking public." N.J.Stat. Ann. § 26:3D–38 (West 1987). Oregon law states: "the people of Oregon find that ... the smoking of tobacco creates a health hazard to those present in *confined places.*" Or.Rev.Stat. § 433.840 (1989) (emphasis added). Rhode Island recognizes the "toxic effect" of tobacco smoke to those who are present in confined places in requiring an employer to accommodate nonsmokers in the workplace. *See* R.I. Gen.Laws § 23–20.7–3(a) (1989). Utah also recognizes that exposure to tobacco smoke is toxic and a potential health hazard. *See* Utah Code Ann. § 76–10–106 (1989). The State of Washington has declared:

"The legislature recognizes the increasing evidence that tobacco smoke in *closely confined places* may create a danger to the health of some citizens of this state. In order to protect the health and welfare of those citizens, it is necessary to prohibit smoking in public places except in areas designated as smoking areas." Wash.Rev.Code Ann. § 70.160.010 (1989 Supp.) (emphasis added).

·The above sampling of state laws is by no means exhaustive. For similar legislative pronouncements, *see* Alaska Stat. § 18.35.300 (1986); Ark.Stat.Ann. § 20–27–701 (1987); Colo. Rev.Stat. § 25–14–101 (1989); Fla.Stat. §§ 386.-201–386.209 (1986); Idaho Code § 39–5501 (1985); Minn.Stat.Ann. §§ 144.411–144.417 (West 1982); Mont.Code Ann. §§ 50–40–101 to 50–40–109 (1987); Neb.Rev.Stat. §§ 71–5701 to 71–5713 (1986); N.H.Rev.Stat.Ann. § 155:50 (1989 Supp.). For a description of legislation in numerous other states at least partially aimed at protecting nonsmokers from the hazards of ETS, *see Note, Smoking In Public: Nonsmokers' Rights and the Proposed Iowa Clean Indoor Air Act,* 37 Drake L.Rev. 483 (1987–88); Note, *An Overview of Current Tobacco Litigation and Legislation,* 8 U.Bridgeport L.Rev. 133 (1987).

**9.** *See* 41 C.F.R. § 101–20.105–3(a) (1989) (regulating smoking in Government Services Administration controlled buildings). The regulation states: "In recognition of the increased health hazards of passive smoke on the non-smoker, smoking is to be held to an absolute minimum in areas where there are non-smokers." *Id.* at § 101–20.105–3(a)(1). *See also* 14 C.F.R. § 252.1–.7 (1989) (regulating smoking aboard aircraft and requiring proper ventilation).

App. § 1374(d)(1)(A) (1990 Supp.)).[10] Finally, municipal ordinances have been enacted to fill voids left by federal and state legislation. *See, e.g., McCarthy v. Department of Social & Health Servs.,* 110 Wash.2d 812, 759 P.2d 351, 355 (1988) (en banc) (discussing local ordinances in State of Washington).

In the face of the health risks of ETS, confirmed by the widespread recognition of the hazards, we conclude that Clemmons' involuntary exposure to ETS in an eight-foot cell raises a triable issue of fact as to whether such exposure creates an unreasonable risk to health. Accordingly, we reverse the district court and hold that Clemmons has raised a genuine fact issue on whether arbitrary exposure to ETS constitutes deliberate indifference to his long-term health and physical well being. On remand, the court must permit Clemmons to present evidence relevant to whether his exposure to ETS in his cell and elsewhere constitutes an unreasonable risk of serious medical injury.[11] Because this case raises substantial and complex factual and legal issues of broad significance which may be beyond the capacity of a pro se prisoner to develop, on remand the trial court should consider whether to appoint counsel for Clemmons. *See* 28 U.S.C. § 1915(d) (1982); *Blankenship v. Meachum,* 840 F.2d 741, 743 (10th Cir.1988) (per curiam) (district court has discretion to appoint counsel in civil cases); *Abdul–Wadood v. Duckworth,* 860 F.2d 280, 288 (7th Cir.1988) (discussing factors trial court should consider in appointment of counsel determination); *Ma-*

*clin v. Freake,* 650 F.2d 885, 887–89 (7th Cir.1981) (per curiam).

### B. The Due Process Claim

 Clemmons also argues that his involuntary exposure to ETS violates his due process rights under the Fourteenth Amendment. Although the exact nature of his due process claim is not altogether clear, the district court apparently perceived Clemmons' due process argument as foreclosed by his failure to state an Eighth Amendment claim.

We have recognized that the Eighth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments operate in tandem to protect the physical well-being of prisoners. In *Harris ex rel. Harris v. Maynard,* 843 F.2d 414, 416 (10th Cir.1988), we stated:

"Where one's very right to life is at stake, and where prison officials control the conditions of confinement, thereby reducing the prisoner's ability to protect himself, it takes no great acumen to determine that, constitutionally, prison officials may not exercise their responsibility with wanton or obdurate disregard for or deliberate indifference to the preservation of the life in their care.... The same is true under the Fourteenth Amendment due process clause.... We conclude that wanton or obdurate disregard of or deliberate indifference to the prisoner's right to life as a condition of confinement is a substantive constitutional deprivation whether it falls under the due process clause or the Eighth Amendment."

---

**10.** Senate statements upon introduction of the bill to ban smoking on airline flights referred to new studies reaffirming the health hazards of exposure to ETS in enclosed places. Incorporated into the Congressional Record was a National Cancer Institute Statement, U.S. Dep't of Health & Human Servs., Feb. 8, 1989, *reprinted at* 135 Cong.Rec. S2258 (daily ed. Mar. 7, 1989) (statement of Sen. Lautenberg) which showed: "Some passengers in the nonsmoking section were exposed to nicotine levels comparable to levels experienced by passengers in the smoking section of the aircraft." *See also* 135 Cong.Rec. S10862 (daily ed. Sept. 12, 1989) (statement of Sen. Lautenberg) (referring to February 10, 1989, study published in Journal of the American Medical Association alluding to Surgeon

General's conclusion that "as many as 5,000 nonsmokers die each year from [i]nhaling the smoke of others").

**11.** Notwithstanding the ever-increasing amount of current evidence of the effects of ETS, coupled with the rapidly evolving changes in state and federal law to protect citizens from ETS, the dissent states that there is no genuine issue of material fact regarding whether defendants' failure to provide Clemmons a non-smoking cellmate constitutes deliberate indifference to a serious health and safety risk. We believe sufficient evidence exists of a serious and unreasonable risk to health from ETS to raise a fact issue.

The question remains whether the substantive due process clause affords prisoners protection distinct from the Eighth Amendment. The Supreme Court has noted that the protections overlap, at least where the claim is one of excessive force:

> "We think the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified. It would indeed be surprising if, in the context of forceful prison security measures, 'conduct that shocks the conscience' ... and so violates the Fourteenth Amendment, *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952), were not also punishment 'inconsistent with contemporary standards of decency' and 'repugnant to the conscience of mankind,' *Estelle v. Gamble,* 429 U.S. at 103, 105 [97 S.Ct. at 290, 291] (1976), in violation of the Eighth.... [We hold] that in these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause."

*Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088; *see also Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989) ("Any protection that 'substantive due process' affords convicted prisoners against excessive force is ... at best redundant of that provided by the Eighth Amendment.").

The present case alleges that prison authorities forced Clemmons to be subjected to a known carcinogen, potentially resulting in debilitating disease or death. We do not perceive any meaningful distinction for our purposes here between claims of excessive force and coerced exposure to health hazards. We therefore conclude that because the Eighth Amendment is the " 'primary source of substantive protection to convicted prisoners,' " Clemmons' due process claim is effectively subsumed within his Eighth Amendment claim. *Berry v. City of Muskogee,* 900 F.2d 1489, 1494 (10th Cir.1990) (quoting *Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088).

We are aware, of course, of our decision in *Kensell v. Oklahoma,* 716 F.2d 1350, 1351 (10th Cir.1983), where we held that a state's refusal to provide a smoke-free environment in a government workplace does not implicate an employee's constitutional due process rights. We reasoned that

> "the plaintiff has voluntarily accepted employment in an office in which he knew or should have known other employees smoke. Upon discovering that he is allergic to smoke or that it exacerbates his health problems, instead of quitting or transferring he seeks to force his employer to install a no-smoking rule in the office or to segregate smokers from nonsmokers."

*Id.* *Kensell* is distinguishable, however. Here, Clemmons faces exposure to ETS in extremely close quarters in his prison setting. Unlike the plaintiff in *Kensell,* Clemmons has no option to quit or transfer. Significantly, moreover, *Kensell* was decided well before the Surgeon General published his 1986 findings concerning the hazards of ETS, and predates other significant government action taken in response to the discoveries of the harmful effects of ETS. Our decision in that case, therefore, is not controlling in the wholly different prison setting involved here. To the contrary, the analysis in *Kensell* serves to underscore Clemmons' total dependence on the state's constitutional obligation to minimize exposure to serious health risks.

### C. The Retaliation Claim

Clemmons also argues that a false and frivolous disciplinary report, resulting in his disciplinary segregation, was submitted in retaliation for filing his lawsuit and for submitting grievances. After reviewing the record, we agree with the district court that "plaintiff's claim rests on nothing more than unsupported speculation and should, therefore, be dismissed as frivolous." Rec., vol. I, doc. 23, at 9.

## IV.

We reverse the district court's dismissal of Clemmons' Eighth Amendment and Fourteenth Amendment claims arising from involuntary exposure to ETS, and remand for further proceedings consistent with this opinion. We affirm the district court's dismissal of Clemmons' retaliation claim.

TACHA, Circuit Judge, dissenting.

I share the majority's concern that exposure to environmental tobacco smoke ("ETS") is a potential health hazard. I cannot agree, however, that such exposure rises to the level of an eighth amendment violation. There is no evidence that Clemmons's health has been adversely affected by cigarette smoke from his cellmate. Moreover, society itself is struggling to balance the rights of smokers and non-smokers at the present time.

I find no basis in eighth amendment jurisprudence for forcing on prison officials, or conversely favoring nonsmoking prisoners with, a constitutionally-mandated health standard that is as yet not enjoyed by those persons living and working outside the prison walls. I find that the majority's effort to engraft a constitutional dimension onto this controversial societal issue constitutes a challenge to the basic purpose of the eighth amendment and the proper role of the federal judiciary. In the immortal words of Chief Justice Marshall, "we must never forget that it is a constitution we are expounding." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819). The majority has forgotten this cornerstone commandment of constitutional jurisprudence.

## I.

The Supreme Court in *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), clearly laid out the eighth amendment analysis governing this case:

> [T]he Eighth Amendment prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime. Among unnecessary and wanton inflictions of pain are those that are totally without penological justification.
>
> No static test can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.... Eighth Amendment judgments should neither be nor appear to be merely the subjective views of judges ... [b]ut ... should be informed by objective factors to the maximum possible extent ... [o]bjective indicia [may be] derived from history, the action of state legislatures, and the sentencing by juries.

452 U.S. at 346–47, 101 S.Ct. at 2399 (quotations, citations, and footnote omitted).

Contrary to the majority's position, *see* maj. op. at note 7, the eighth amendment does not sweep so broadly as to include possible latent harm to Clemmons's health. This court has previously held that the "core areas" of any eighth amendment claim are shelter, sanitation, food, personal safety, medical care, and adequate clothing. *Ramos v. Lamm,* 639 F.2d 559, 566 & n. 8 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *see Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399 (conditions of confinement in *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), and *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), violated eighth amendment because of serious deprivations of basic necessities of life); *Inmates of Occoquan v. Barry,* 844 F.2d 828, 836–39 (D.C.Cir.1988) ("deprivations" that trigger eighth amendment scrutiny are deprivations of essential human needs—food, shelter, health care, and personal safety). Clemmons's complaint that he is forced to share a cell with a smoker does not implicate any of these core eighth amendment areas, *see Ramos,* 639 F.2d at 566 & n. 8, nor does exposure to ETS "deprive [Clemmons] of the minimal civilized measure of life's necessities,"

*Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399; *Inmates of Occoquan,* 844 F.2d at 836–39.

If Clemmons's claim colorably touches the most peripheral edge of a core eighth amendment area, it would be the area of adequate medical/health care. Clemmons's complaint of exposure to ETS, however, simply does not rise to the level of "deliberate indifference" to an inmate's serious illness or injury, *e.g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (severe back pain and high blood pressure), nor is it comparable to the situation where prison conditions are so horrible that there is an immediate and substantial danger to the health and safety of the inmates, *e.g., Ramos,* 639 F.2d 559 (substandard conditions of shelter, sanitation, food, personal safety, and medical care); *Battle v. Anderson,* 564 F.2d 388 (10th Cir.1977) (191% overcrowding resulting in substandard living conditions). The deliberate indifference standard for medical care requires that the inmate's illness or injury be a *serious* one, *Estelle,* 429 U.S. at 104–05, 97 S.Ct. at 291–92; *Brown v. Hughes,* 894 F.2d 1533, 1538 n. 4 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990), for example: four knife stab wounds, *Reed v. Dunham,* 893 F.2d 285 (10th Cir.1990), broken bones rendering limbs useless or the plaintiff unconscious; *Mandel v. Doe,* 888 F.2d 783 (11th Cir.1989) (cracked hipball joint); *Brown,* 894 F.2d 1533 (broken foot); *Simpson v. Hines,* 903 F.2d 400 (5th Cir. 1990) (neck trauma), symptoms of a heart attack, *Miltier v. Beorn,* 896 F.2d 848 (4th Cir.1990) (chest pains, shortness of breath, dizziness), or chronic illness, *White v. Napoleon,* 897 F.2d 103 (3d Cir.1990) (epilepsy); *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990) (schizophrenic with suicidal tendencies). Clemmons does not have a *serious* medical need; he has alleged *no* adverse physical symptoms from cigarette smoke. Clemmons's complaint regarding ETS is simply of a different order of magnitude from those cases which have found an eighth amendment violation due to deliberate indifference to a serious medical need.

The majority's conclusion that Clemmons has introduced a genuine issue of material fact supporting a claim under the eighth amendment due to the "unreasonable risk of debilitating" effects from ETS is nothing short of surprising. In *Rhodes,* the Supreme Court solidly rejected the argument of Justice Marshall, who would have found an eighth amendment violation whenever prison conditions "if left unchecked, [would] cause deterioration in [the prisoners'] mental and physical health." *Id.* 452 U.S. at 375, 101 S.Ct. at 2414 (Marshall, J., dissenting). Eight justices found that although 38 percent overcrowding and double-celling in fifty-five square foot cells were not desirable, these conditions did not "inflict unnecessary or wanton pain," *id.* at 348, 101 S.Ct. at 2400, were not "grossly disproportionate to the severity of the crimes," *id.,* and did not rise to the level of an eighth amendment violation. *See id.* at 348–50 & n. 15, 101 S.Ct. at 2400–01 & n. 15; *id.* at 366–68, 101 S.Ct. at 2409–10 (Brennan, J., with Blackmun and Stevens, JJ., concurring). In light of *Rhodes,* the majority's reliance on a broad reading of *Ramos*'s and *Battle*'s "healthy habilitative environment" language is misplaced. Accordingly, I would find that requiring Clemmons to share a cell with a smoker does not create a genuine issue of material fact implicating a core area protected by the eighth amendment. *See Inmates of Occoquan,* 844 F.2d at 837–39 ("If the necessities are provided, then the Eighth Amendment has been satisfied....").

Furthermore, the majority has not identified a genuine issue of material fact supporting an eighth amendment violation under *Rhodes* because it cannot point to proper objective factors supporting its conclusions regarding society's evolving standards of decency. The 1986 Surgeon General's report, U.S. Dep't of Health & Human Servs., *The Health Consequences of Involuntary Smoking* (1986) [hereinafter 1986 Surgeon General's report], heavily relied upon by the majority, does not establish a minimum constitutional standard; rather, it recommends a public health goal that society should strive to achieve, and calls for more research. Public health recommendations by medical experts—even

the Surgeon General—do not constitute "contemporary standards of decency." When determining contemporary standards of decency, *"of greatest importance under the Constitution is the public's attitude toward a given sanction or condition,"* Inmates of Occoquan, 844 F.2d at 836–37 (emphasis in original). *See Rhodes,* 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13 (recommendations of professional groups do not constitute constitutional minima; rather, they establish goals recommended by the organization in question); *Bell v. Wolfish,* 441 U.S. 520, 544 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979) (same); *Inmates of Occoquan,* 844 F.2d at 837 (professional standards do not serve as constitutional benchmarks).

Looking to objective indicia of the general public's attitude, as we must, *see Rhodes,* 452 U.S. at 346–47, 101 S.Ct. at 2399–2400, a review of the state legislation cited by the majority as forbidding or restricting smoking reveals that the vast majority of these laws are limited to public places, which are statutorily defined so as to *exclude* prisons.[1] Thus, although society's attitude as indicated by the objective factor of state legislation shows a trend toward protecting the rights of nonsmokers in public places, society has *expressly rejected* extending these protections to prisons and nonsmoking prisoners. The majority paves the way for the constitutionalization of a public health goal for prisoners that the vast majority of state legislatures has expressly rejected.

The fundamental error of the majority's approach lies in the presumption that it is the duty of the courts to spearhead society's evolving standard of decency. Rather, the Supreme Court has emphasized that it is our duty to apply *society's* standard even though the standard may be "restrictive and even harsh," *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399, lest we violate the injunction that "Eighth Amendment judgments should neither be nor appear to be merely the subjective view" of judges, *Rummel v. Estelle,* 445 U.S. 263, 275, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980). The Court in *Rhodes* specifically cautioned against what the majority is doing here—that is, using the Constitution to reform prisons according to "a court's idea of how best to operate a prison facility." *Rhodes,* 452 U.S. at 351, 101 S.Ct. at 2401. Although it may be unpleasant for Clemmons to share a cell

1. In roughly the order cited by the majority, *see* Kan.Stat.Ann. § 21–4009 (1988) ("public place" defined as enclosed indoor areas open to the public or used by the general public); Cal. Health & Safety Code § 25949 (1990) (eliminating smoking on public transportation vehicles); Me.Rev.Stat.Ann. 22, § 1672–A(1) (1989) (smoking in shopping centers restricted); Ariz.Rev. Stat.Ann. § 36–601.01 (1986) (restricting smoking in certain public areas); *id.* § 36–601.02(C) (specifically exempting inmate use areas within state prisons from smoking restrictions); N.J. Stat.Ann. § 26:3D–39 (1985) ("indoor public place" defined as a structurally closed area generally accessible to the public which is not owned or leased by a governmental entity); Or. Rev.Stat. § 433.835 (1989) ("public place" means any enclosed indoor area open to and frequented by the public); R.I.Gen.Laws § 23–20.7–3 to .7–4 (1989) (restricting smoking in the workplace); Utah Code Ann. § 76–10–106 (1989) (restricting smoking in public places, schools, and child care centers); Wash.Rev. Code Ann. § 70.160.010 (1989) (restricting smoking in public places); Ark.Stat.Ann. § 20–27–703 (1987) (restricting smoking in patient areas of medical facilities and on school buses); Colo.Rev.Stat. §§ 25–14–102, 25–14–103 (1989) ("public place" defined as an enclosed indoor area used by the general public or serving as a place of work); Fla.Stat. § 386.203(1) (1986) (areas accessible to general public); Idaho Code § 39–5502 (1985) ("public place" defined as any enclosed indoor area used by the general public); Minn.Stat.Ann. § 144.413 (1987) ("public place" defined as any enclosed indoor area used by the general public or serving as a place of work); Mont.Code Ann. § 50–40–103 (1987) ("enclosed public place" defined as any indoor area, room, or vehicle used by the general public or serving as a place of work); Neb.Rev.Stat. § 71–5704 (1986) ("public place" defined as any enclosed area used by the general public or serving as a place of work); *see also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 576 n. 11, 100 S.Ct. 2814, 2827 n. 11, 65 L.Ed.2d 973 (1980) (prisons by definition are not public places). *But see* N.M.Stat.Ann. § 24–16–3(D) (1985) ("public place means any enclosed indoor area in a building owned or leased by the state or any of its political subdivisions."); Alaska Stat. § 18.35.300(3) (1986) (buildings owned or leased by state or political subdivision); N.H.Rev.Stat.Ann. § 155:45(II) (1989) ("'enclosed public places' means any enclosed, indoor area which is publicly owned or supported by tax revenues.").

with a smoker, "the Constitution does not mandate comfortable prisons." *Id.* at 349, 101 S.Ct. at 2400. Clemmons's discomfort does not violate the evolving minimum standards of decency that mark our society today.

A constitutional right to a smoke-free cell would have no limits and it would open a Pandora's box of constitutional challenges for prison administrators. ETS is not contained by bars or even walls. The 1986 Surgeon General's report states that "[t]he data contained in this Report on the rapid diffusion of tobacco smoke throughout an enclosed environment suggests that separation of smokers and nonsmokers in the same room or in different rooms that share the same ventilation system may reduce ETS exposure but will not eliminate exposure." *Id.* at xii.[2] If Clemmons is successful on remand, prison administrators eventually may be forced to house smokers and nonsmokers in separate facilities to eliminate the nonsmokers' exposure to ETS. I find no justification whatsoever for making the rights of nonsmoking prisoners paramount over the myriad of health and security concerns that prison officials must confront and balance daily. At worst, the majority opinion lays the groundwork for a constitutional burden that will be impossible for prison authorities to carry, given the well-documented state of our underfinanced and overcrowded prison systems. At best, the majority imposes an unwarranted and unprecedented constraint on the discretion of prison administrators to balance potential versus immediate health and safety concerns. As Judge Leon Higginbotham has stated, "[t]he eighth amendment does not confer upon this Court the authority to impose upon [prison administration] our notions of enlightened policy." *Hassine v. Jeffes*, 846 F.2d 169, 175 (3d Cir.1988).

**II.**

Finally, I also am troubled by the majority opinion because it sets up a tension between the state's reserved powers over public health, safety, and welfare and the concern of the federal courts with the constitutionally humane treatment of those imprisoned. We do not need to create such a tension; we need only decide if it is cruel and unusual punishment for a nonsmoking prisoner to be celled with a smoking one. I would find that it is not.

### ORDER

Before HOLLOWAY, Chief Judge, McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY, and EBEL, Circuit Judges.

Appellees' petition for rehearing and suggestion for rehearing en banc are granted. Judges McKay and Seymour would deny rehearing.

A supplemental briefing schedule will be set by a subsequent order.

### ORDER

Appellees' petition for rehearing was granted by order of November 14, 1990, which is ordered published. David Gottlieb of the University of Kansas Defender Project is appointed as counsel for appellant. Appellees may file a supplemental brief within twenty days of the date of this order. Appellant may file a response brief within twenty days of service of appellees' brief. Appellees may file a reply brief within ten days of service of appellant's response brief.

---

**2.** This diffusion charactistic merely underscores the reality that with regard to ETS, "you can run, but you cannot hide," at least not unless and until all of society foregoes smoking. Thus, even though a nonsmoker may attempt to avoid ETS by "voluntarily" leaving a smoking environment, he or she cannot escape some level of exposure. *See Kensell v. Oklahoma*, 716 F.2d 1350 (10th Cir.1983). To contend that the invol-

untary nature of Clemmons' confinement distinguishes this case from the dilemma of the employee in *Kensell* ignores the fact all nonsmokers in society today are to some extent "involuntarily" exposed to ETS. What gives nonsmoking prisoners the privilege to be more insulated from ETS than the rest of society? Certainly not the Constitution.