**UNITED STATES of America,**

v.

**Sean SAULS.**

**No. 94–1861R.**

United States District Court,
D. Maryland.

Oct. 8, 1997.

John Guckert, Special Assistant U.S. Atty., for U.S.

Christine Saverda Nielson, Baltimore, MD, for Sean Sauls.

## *OPINION*

ROSENBERG, United States Magistrate Judge.

Sean Sauls was charged by violation notices with several traffic offenses occurring at Aberdeen Proving Ground, Maryland, in the vicinity of Raritan Road, on July 17, 1994. A complaint approved by the Court on October 5, 1994, was filed and superseded the violation notices issued on July 17, 1994, except as to one of the charges. All of the pending charges are charged as violations of 18 U.S.C. § 13, the Assimilative Crimes Act. The assimilated offenses are driving while intoxicated, driving while under the influence of alcohol, driving while under the influence of drugs or a combination of drugs and alcohol, driving on a highway at a time when the defendant's privilege to drive was suspended in the state of Virginia, and failing to display drivers license upon demand of a uniformed police officer, in violation of the Md.Code Ann., Trans. II, §§ 21–902(a), 21–902(b), 21–902(c), 16–303(f), and 16–112(c) (1992) respectively.[1] Subsequently, the defendant executed a waiver of his right to trial, judgment, and sentencing before a United States District Judge as well as his right to a jury trial

---

1. Unless otherwise indicated, the statutory provision referred to herein relate to their terms as they existed on the date of the offenses, July 17, 1994, and not to any subsequent amendments.

and consented to trial before a United States Magistrate Judge without a jury.

In connection with the traffic stop a breathalyzer test (used herein as a generic term) was administered to determine the alcoholic content of the defendant's breath. In accordance with the general practice at Aberdeen Proving Ground, the military police purportedly utilized the procedures set forth in the Md.Code Ann.Trans. II, § 16–205.1 (1992) and Md.Code Ann., Cts. & Jud.Proc., §§ 10–302 through 10–305 (1995).

A motion to suppress evidence has been filed on behalf of the defendant attacking the admissibility of the chemical test, the breathalyzer result, as well as the admissibility of the presumptions that arise from the test result under Md.Code Ann., Cts. & Jud. Proc., § 10–307 (1995).

The defendant has raised the following issues concerning the chemical test: (1) the military police should have utilized the federal implied consent law under 18 U.S.C. § 3118 rather than the state procedure under Trans. II, § 16–205.1, (2) by utilizing the state procedure and not utilizing the federal procedure, the defendant was coerced into taking the chemical test and the test was not otherwise the result of a free and voluntary informed choice, (3) the test was not administered by a "qualified person" as required by Cts. & Jud.Proc. § 10–304; and therefore, the test result should not be received in evidence and (4) even if the test results are admissible at trial, the Maryland presumptions under Cts. & Jud.Proc. § 10–307 are not assimilated under the Assimilative Crimes Act as due to their evidentiary character, they are not subject to assimilation.

In the event the Court were to determine that the defendant is correct on issue No. 4, the Court, on its own, requested the parties to submit a supplemental memorandum as to whether the Court could take judicial notice that certain inferences could be drawn from the chemical test result concerning the defendant's state of sobriety when the offenses are alleged to have occurred.

■ The Assimilative Crimes Act provides that conduct occurring on land under the special maritime and territorial jurisdiction of the United States which is not expressly prohibited by federal law is governed by the penal laws of the state where the land is located. 18 U.S.C. 13(a). The Assimilative Crimes Act assimilates the entire substantive law of the state, including laws relating to the elements or definition and scope of an offense and laws governing the manner in which an offense is to be punished. *United States v. King*, 824 F.2d 313, 315 (4th Cir. 1987); *United States v. Price*, 812 F.2d 174, 175 (4th Cir.1987). Although the Assimilative Crimes Act assimilates state substantive law pertaining to the elements of an offense and its punishment, it does not generally adopt state procedures or rules of evidence. *United States v. Wilmer*, 799 F.2d 495 (9th Cir.1986), *cert. denied.* 481 U.S. 1004, 107 S.Ct. 1626, 95 L.Ed.2d 200 (1987); *Kay v. United States*, 255 F.2d 476, 479 (4th Cir.), *cert. denied*, 358 U.S. 825, 79 S.Ct. 42, 3 L.Ed.2d 65 (1958); *United States v. Price, supra.*

■ Both sides have taken the position that the federal implied consent statute applies to this case rather than Md.Code Ann. Trans. II, § 16–205.1. The Court agrees that the Maryland Statute establishes a procedural provision outside the ambit of the Assimilative Crimes Act. Accordingly, the military police were not required to follow the Maryland procedure and should have followed the procedure established by 18 U.S.C. § 3118. *United States v. Roberts*, 845 F.2d 226, 228–229 (9th Cir.1988), *United States v. Rogers*, 926 F.Supp. 1000 (D.Colo.1996), *United States v. Hopp*, 943 F.Supp. 1313 (D.Colo. 1996).

Transportation § 16.205.1 in pertinent part provides:

(a)(2) Any person who drives or attempts to drive a motor vehicle on a highway or on any private property that is used by the public in general in this state is deemed to have consented, subject to the provisions of § 10–302 through 10–309, inclusive, of the Courts and Judicial Proceedings Article, to take a test if the person should be detained on suspicion of driving or attempting to drive while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person

could not drive a vehicle safely, while under the influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16–813 of this title.

(b) No compulsion to take chemical test; consequences of refusal.—(1) Except as provided in subsection (c) of this section, a person may not be compelled to take a test. However, the detaining officer shall advise the person that, on receipt of a sworn statement from the officer that the person was so charged and refused to take a test, or was tested and the result indicated an alcohol concentration of 0.10 or more, the Administration shall:

(I) In the case of a person licensed [or unlicensed] under this title:

    1. For a test result indicating an alcohol concentration of 0.10 or more at the time of testing:

    A. For a first offense, suspend the driver's license [or driving privilege] for 45 days; or

    B. For a second or subsequent offense, suspend the driver's license [or driving privilege] for 90 days; or

    2. For a test refusal:

    A. For a first offense, suspend the driver's license [or driving privilege] for 120 days; or

    B. For a second or subsequent offense, suspend the driver's license [or driving privilege] for 1 year.

The statute has been construed by the Maryland Court of Appeals as requiring an affirmative consent from the individual to be tested. *State v. Loscomb*, 291 Md. 424, 435 A.2d 764 (1981). Rather than being an implied consent statute, it has been described as an express consent statute. *State v. Moon*, 291 Md. 463, 492–493, 436 A.2d 420, 435 (1981), Davidson J. dissenting. Furthermore, Form DR–15 utilized by the State of Maryland and by the military police in this case specifically advises that, "you have the right to refuse to submit to the test". Although Cts. & Jud. Proc. § 10–309(a)(2) indicates that a refusal to submit to a chemical test is admissible in evidence at trial, the Court of Appeals of Maryland has held that ordinarily the refusal is not admissible but may be admitted under some circumstances in connection with a collateral matter not related to the issue of guilt. *Krauss v. State*, 322 Md. 376, 587 A.2d 1102 (1991).

18 U.S.C. § 3118 provides:

(a) Consent—Whoever operates a motor vehicle in the special maritime and territorial jurisdiction of the United States consents, thereby, to a chemical test or tests of such person's blood, breath, or urine, if arrested for any offense arising from such person's driving while under the influence of a drug or alcohol in such jurisdiction. The test or tests shall be administered upon the request of a police officer having reasonable grounds to believe the person arrested to have been driving a motor vehicle upon the special maritime and territorial jurisdiction of the United States while under the influence of drugs or alcohol in violation of the laws of a State, territory, possession, or district.

(b) Effect of Refusal—whoever, having consented to a test or tests by reason of subsection (a), refuses to submit to such a test or tests, after having first been advised of the consequences of such a refusal, shall be denied the privilege of operating a motor vehicle upon the special maritime and territorial jurisdiction of the United States during the period of a year commencing on the date of arrest upon which such test or tests was refused, and such refusal may be admitted into evidence in any case arising from such person's driving while under the influence of a drug or alcohol in such jurisdiction. Any person who operates a motor vehicle in the special maritime and territorial jurisdiction of the United States after having been denied such privilege under this subsection shall be treated for the purposes of any civil or criminal proceedings arising out of such operation as operating such vehicle without a license to do so.

The defendant contends that the use of the Maryland procedure rather than following the Federal procedure invalidates the chemical test administered to him. It is contended that he was unable to make a free, voluntary and informed choice whether to consent to the chemical test. Specifically, it is contended that he may have refused the test upon being informed that any suspension of driv-

ing privileges would have been limited to driving within the special maritime and territorial jurisdiction of the United States for a period of one year which, the defendant contends, is a less severe sanction than the suspension imposed by the State of Maryland even though the length of the suspension under Maryland law would be substantially less. If suspended from driving in the State of Maryland, it is likely that he would not be permitted to drive in any State in the United States while the Maryland suspension was in effect. Most States have laws similar to Maryland's which prohibit an individual from driving whenever the individual's privilege to drive is suspended by another State. *See,* Trans. II, § 16–303. Although it is debatable, the defendant may be correct in his contention that the Maryland administrative penalties are more severe than those imposed under the Federal statute. *See, United States v. Imngren,* 98 F.3d 811, 816 (4th Cir.1996).

■ On the other hand, the Court is satisfied that under the Federal statute, the defendant had no legal right to refuse to take the chemical test as a refusal is not a permissible choice. This Court respectfully disagrees with the conclusion to the contrary in *United States v. Rogers, supra.* Under the statute the request is directed to the person administering the test. It is not directed to the person arrested:

It is clear that an individual may be compelled to take a chemical test so long as there are reasonable grounds to believe that the person was driving a motor vehicle while under the influence of alcohol or drugs. *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), *United States v. Reid,* 929 F.2d 990 (4th Cir.1991), *See also,* 36 C.F.R. § 4.23(c)(2). Of course, unreasonable physical violence in administering the test would likely not be sanctioned and would likely invalidate the test. *See, South Dakota v. Neville, supra* and *Schmerber v. California, supra. See also, People v. Hanna,* 223 Mich.App. 466, 567 N.W.2d 12, (1997, released Aug. 16, 1997), 61 CrL 1447 (8/20/97).

The problem of the drunk driver is one of the major issues facing our nation today. Although there may have been some improvement in the recent past in the reduction of fatalities caused by drunk drivers, the issue is one of major proportions. The Supreme Court in recognizing this problem stated:

The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This court although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy. See *Breithaupt v. Abram,* 352 U.S. 432, 439, [77 S.Ct. 408, 412, 1 L.Ed.2d 448] (1957). ("The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield"); *Tate v. Short,* 401 U.S. 395, 401, [91 S.Ct. 668, 672, 28 L.Ed.2d 130] (1971) (BLACKMUN, J., concurring) (deploring "traffic irresponsibility and the frightful carnage it spews upon our highways"); *Perez v. Campbell,* 402 U.S. 637, 657, 672, [91 S.Ct. 1704, 1715, 1722, 29 L.Ed.2d 233] (1971) (BLACKMUN, J., concurring) (footnote omitted) ("The slaughter on the highways of this Nation exceeds the death toll of all our wars"); *Mackey v. Montrym,* 443 U.S. 1, 17–19, [99 S.Ct. 2612, 2620–2621, 61 L.Ed.2d 321] (1979) (recognizing the "compelling interest in highway safety"). *South Dakota v. Neville, supra,* at pp. 558–559 [103 S.Ct. at pp. 919–920].

*See also, United States v. Reid, supra,* 929 F.2d at p. 993.

Congress is acutely aware of the problem and has taken steps to encourage the states to modify their drunk driving laws in an effort to remedy the problem. For example a number of federal grants are contingent upon a state's compliance with certain standards mandated by Congress. *See,* 23 U.S.C. §§ 408 and 410. As a result of the severity of the problem it is inconceivable that Congress in passing the federal implied consent statute intended to give an individual a legal right of refusal.

■ Although the defendant was misinformed concerning the applicability of the Maryland implied consent law, this mistake

does not invalidate a test which the defendant did not have the right to refuse. Any error that occurred was harmless.[2] The Court agrees with the position taken by the government on this issue.

It is without question that the defendant by his very act of operating a motor vehicle in the special territorial jurisdiction of the United States consented to the chemical test which was administered to him. Although he could have refused the test, he had no statutory right to do so, and the military police had no statutory obligation to advise him that he had a right to refuse. It is true that the defendant must be advised of the consequences of refusal if the government intends to enter the refusal into evidence at trial or suspend defendant's driving privileges, however, there is no obligation to advise him he had a right to refuse. The question then is how was defendant harmed; how was he mislead or coerced into taking a test that the federal law required he take, such that his due process rights were violated.

Clearly, defendant's due process rights were not violated. The reality is that he received more rights than those to which he was actually entitled. Most notably, the right to refuse the chemical test. Government's reply pp. 7–8.

Under Maryland law, a breathalyzer test in connection with a prosecution for driving while intoxicated or while under the influence must be administered by a "qualified person." A qualified person is defined in Md. Code Ann., Cts. & Jud.Proc. § 10–304(a)(3) as,

> a person who has received training in the use of the equipment in a training program approved by the toxicologist under the Postmortem Examiners Commission and who is either a police officer, a police employee, an employee of the office of the Chief Medical Examiner, or a person authorized by the toxicologist under the Postmortem Examiners Commission.

■ It is not contended that the person administering the breathalyzer test was not trained under the auspices of the State Toxicologist. It is contended that the individual ceased to be a "qualified person" because certain record keeping requirements and/or the manner in which the test was administered did not comply with the Regulations of the Toxicologist Postmortem Examiners Commission, State of Maryland. Although certain records may have been kept, the regulations of the toxicologist require that the test results and certain related information be recorded in an Alcohol Testing Program Log. This was not done. Furthermore, it is alleged that there was a failure to record the results of a simulation test prior to the defendant's test or perhaps a simulation test was not performed at all although allegedly required by the regulations of the toxicologist.[3]

If the person administering the breathalyzer test to the defendant did not keep records in the form required by the regulations of the toxicologist or if the individual did not

---

**2.** For the most part, jurisdiction at Aberdeen Proving Ground, Maryland, is under the exclusive legislative jurisdiction of the United States. *United States v. Holmes*, 414 F.Supp. 831 (D.Md. 1976). Nevertheless, the Court is aware that the State routinely suspends an individual's license or privilege to drive under Trans. II, § 16–205.1 for events occurring at Aberdeen Proving Ground, Maryland. The Court is of the opinion that there is substantial merit to the defendant's argument that Maryland does not have the authority to apply its suspension procedures for events occurring on property in which jurisdiction is exclusively federal, at least without legislative authority. The Court assumes that the validity of the State's action is an issue that ultimately will be decided administratively by the Maryland Motor Vehicle Administration and/or by the Courts of the State of Maryland. The Court also notes that points are routinely assessed for traffic offenses occurring at Aberdeen Proving Ground, Maryland, charged under the Assimilative Crimes Act, by the Maryland Motor Vehicle Administration under Maryland's point assessment statute, Trans. II, § 16–402. The validity of this action may also be questionable. On the other hand, the state legislature has authorized the Motor Vehicle Administration for the State to suspend an individual's driving privilege for either failing to appear or failing to pay a fine in connection with a traffic offense which is the subject of a proceeding before the United States District Court for the District of Maryland. *See,* Trans. II, § 26–206 and § 27–103.

**3.** A simulation test is a test performed by the person administering the test utilizing a known alcohol reference solution as an aid in determining whether the testing equipment is providing accurate results.

perform a simulation test, such failures would not invalidate the individual's status as a qualified person, and even if the individual had not been trained by the state toxicologist, this would not affect the admissibility of the test result in a Federal prosecution. As the defendant has correctly noted, the Assimilative Crimes Act does not assimilate state rules of procedure or evidence. Ordinarily, a failure to follow a particular prescribed procedure may go to the weight to be given the evidence rather than its admissibility. Of course, in some cases, a Court may find the procedure utilized to be so unreliable so as to preclude the evidence from being considered by the trier of fact. Whether the defendant can prove that the procedure utilized so infected the reliability of the test result so as to preclude its admission into evidence is a matter that may require an evidentiary hearing either during or prior to the trial of the case. In any event, all that has been alleged thus far are matters that go to the weight of the evidence and not to its admissibility.

In Federal prosecutions the admissibility of evidence is governed by Federal standards. *See generally,* Rule 26 of the Federal Rules of Criminal Procedure and the Federal Rules of Evidence for United States Courts and Magistrates. Any failure to comply with the regulations of the state toxicologist or any of the other state procedures does not affect the admissibility of the evidence. In determining its admissibility, the Court will apply the appropriate Federal standards. *See, United States v. Roberts,* 845 F.2d 226, 228–229 (9th Cir.1988); *United States v. McMillan,* 820 F.2d 251, 255 (8th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 193 (1987); *United States v. Wilmer,* 799 F.2d 495 (9th Cir.1986), *cert. denied,* 481 U.S. 1004, 107 S.Ct. 1626, 95 L.Ed.2d 200 (1987); *United States v. Smith,* 776 F.2d 892 (10th Cir.1985); *United States v. Tyson,* 829 F.Supp. 368, 371 (M.D.Ala. 1993); *United States v. Farmer,* 820 F.Supp.

259 (W.D.Va.1993). *See also, United States v. Dreos,* 156 F.Supp. 200, 208 (D.Md.1957).[4]

The defense contends that the Court cannot utilize what is referred to as the statutory presumptions contained in Md. Code Ann., Cts. & Jud.Proc. § 10–307(d) and (e). Under these provisions, an alcohol concentration of 0.07 or more shall be prima facie evidence that the defendant was driving while under the influence of alcohol, and an alcohol concentration of 0.10 or more shall be prima facie evidence that the defendant was driving while intoxicated. It is contended that § 10–302 through § 10–309 are procedural and/or evidentiary in nature and thus are not assimilated under the Assimilative Crimes Act just as the Maryland implied consent law is not assimilated.[5]

On the other hand, the Government contends that the statutory presumptions are admissible and are to be considered by the Court with all of the evidence to be presented at the trial in determining the defendant's guilt or innocence. *Kay v. United States, supra* appears to be directly on point in support of the Government's position. In *Kay,* the Fourth Circuit concluded that even though state rules of evidence were not assimilated, the statutory presumptions under the law of the Commonwealth of Virginia applied to a prosecution under the Assimilative Crimes Act for driving while under the influence of intoxicants. The Court noted that while the Virginia statute may be said to be largely procedural, it was a preliminary, pre-judicial procedure which may be employed only with the consent of the accused, designed for the protection of the accused, to insure the reliability of the report of the test and to protect the validity of the presumptions established by the Virginia statute. The Court held that the Virginia statute setting forth the presumptions,

4. Although Trans. II § 10–309 precludes the admissibility of the test or analysis if the evidence is obtained contrary to the provisions of the Transportation Article, it may well be that even in a prosecution by the State of Maryland, the test result would still be admissible into evidence except the state would be precluded from relying on the statutory presumption set forth in § 10–307. *See, State v. Moon,* 291 Md. 463, 436 A.2d

420 (1981), *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *Langway v. State,* 94 Md.App. 407, 617 A.2d 1117 (1993).

5. The Court notes that the defendant's position is somewhat inconsistent in light of his claim discussed above that the test result should not be admitted into evidence because the person administering the test was not a "qualified person."

supplied a new and more objective test and definition for an accused who consents to a blood analysis. The new test is designed to protect an accused whose faculties are not impaired, while withholding protection from one, who, under the sobering influence of an accident or arrest, is able temporarily to avoid the appearance of intoxication. As a new definition of the substantive offense, we conclude that it was adopted by the Assimilative Crimes Act of 1948.

*Kay* at p. 480.

The Court also noted in *Kay* that the presumption of driving under the influence was rebuttable, and that it was to be considered with all of the other evidence in the case.

Although *Kay* would appear to be dispositive, the defendant contends that the Courts of Maryland have clearly recognized that the presumptions set forth in § 10–307 are evidentiary in nature and thus should not be assimilated. In this connection, it is alleged that the Virginia statute in *Kay* was part and parcel of the statute defining the offense of driving while intoxicated. The relevant sections of the Virginia code were § 18–75 which prohibited the offense of driving while (intoxicated) under the influence of alcohol, § 18–75.1 which provided for a chemical analysis of a blood sample taken with the consent of the accused, § 18–75.2 directed the receipt in evidence of a certificate showing the result of the analysis and § 18–75.3 established certain presumptions which arose out of the finding of the alcoholic content of the sample. All of these provisions were contained in that portion of the Virginia code defining or describing crimes and offenses generally. Accordingly, the statutory presumptions were set forth in a closely related statute to that defining the offense. Conversely, the Maryland provisions are not set forth in that portion of the code that either define offenses generally or that specifically define traffic offenses. As noted above, the section in question is part of the Courts & Judicial Proceedings portion of the code and is set forth under Title 10. Evidence, Subtitle 3. Motor Vehicle Laws.

Under the law of the State of Maryland it is clear that Maryland considers the presumptions set forth in Cts. & Jud.Proc. § 10–307 as evidentiary in nature and would not be considered by any stretch of imagination as a redefinition of the offenses of driving while intoxicated or while under the influence. In *State v. Loscomb, supra,* 291 Md. at pp. 429–430, 435 A.2d at p. 767, in discussing the predecessor of what is now Cts. & Jud.Proc. §§ 10–302 to 10–309, the Court observed that,

> Thus, Art. 35, § 100 had the broad purpose of establishing a rule of evidence applicable in prosecutions for the violation of any law concerning a person accused of driving while intoxicated or impaired.

It is also noteworthy that Art. 35 was the Evidence Article of the Maryland Code. Furthermore, the Court noted that these sections were to be read in *pari materia* with the implied consent statute, Trans. II 16–205.1 which, as discussed above, is purely procedural. In addition, the Court of Appeals of Maryland in discussing Art. 35 § 100 stated,

> Since this statute deals with a matter of evidence, we think that it may properly be considered in reviewing a case tried after its enactment, even though the accident here involved occurred prior thereto.

*Alston v. Forsythe,* 226 Md. 121, 132–133, 172 A.2d 474, 479 (1961). Furthermore, Maryland's intermediate appellate court has stated that it is improper to use the term "prima facie evidence" in instructing a jury in connection with the presumptions although it is the term used in the statutory provisions.

> In the face of a timely objection, the trial judge read to the jury § 10–307, including subsection (e) which provides
>
>> If at the time of testing there was in the person's blood 0.13 percent or more by weight of alcohol, as determined by an analysis of the person's blood or breath, it shall be prima facie evidence that the defendant was intoxicated.
>
> This instruction, which the State concedes should not have been given, plainly told the jury that they could indulge in a prima facie inference that Briscoe was intoxicated. The statutory "prima facie evidence" language is, of course, addressed to the trial judge. It tells him, in effect, that if certain evidence has been introduced (after

compliance with the statutory preconditions) there is a case sufficient to go to the jury—a case in which the jury may but is not required to find intoxication. In the case before us, we cannot hold that the "prima facie evidence" instruction was not prejudicial so far as the driving while intoxicated charge is concerned. Use of the "prima facie evidence" wording of § 10–307(e) might have incorrectly persuaded the jury that this was a statutory presumption, thus requiring Briscoe to rebut it. *Briscoe v. State,* 60 Md.App. 42, 45–46, 479 A.2d 1385, 1386, *cert. denied,* 302 Md. 8, 485 A.2d 249 (1984).

Moreover, since the time of the defendant's alleged offenses, Maryland has amended Trans. II § 21–902. In pertinent part this section at present provides,

(a) Driving while intoxicated or intoxicated per se.—(1) A person may not drive or attempt to drive any vehicle while intoxicated.

(2) A person may not drive or attempt to drive any vehicle while the person "is intoxicated per se".

(b) Driving while under the influence of alcohol.—A person may not drive or attempt to drive any vehicle while under the influence of alcohol.

The offense of driving while intoxicated has been divided into two separate and distinct categories. § 21–902(a)(1) is the offense of driving while intoxicated as it has existed in Maryland for many years. In order to prove this offense the state must prove beyond a reasonable doubt that the defendant was in an intoxicated condition and that otherwise the defendant's normal coordination or normal abilities were substantially impaired by the consumption of alcohol. Under § 21–902(a)(2) the state need not prove any impairment of the defendant's normal coordination or abilities as being "intoxicated per se" is defined as follows,

"Intoxicated per se" means having an alcohol concentration at the time of testing of 0.10 or more as measured by grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath. Trans. II § 11–127.1

It is also noteworthy that at present there is no statutory presumption for driving while intoxicated in Cts. & Jud.Proc. § 10–307 as it is unnecessary because of the *per se* offense. On the other hand a presumption still exists for driving while under the influence of alcohol as a test result of at least 0.07 but less than 0.10 shall be considered prima facie evidence that the defendant was under the influence of alcohol. Cts. & Jud.Proc. § 10–307(d).

Based upon the placement of the pertinent provisions under an article or title designated as Evidence, the statements of the Maryland Courts indicating that § 10–307 is evidentiary in nature and the fact that the Maryland legislature subsequently enacted the *"per se"* offense which does not require any evidence of impairment, it is manifest that it would be inappropriate to consider the Maryland presumptions that were in effect on July 17, 1994, or thereafter to be a redefinition of the offenses of driving while intoxicated or while under the influence. Furthermore, the authoritative interpretation by the courts of the State of Maryland of Maryland law should ordinarily be accepted as binding on a Federal Court; so that, the provisions of Trans. II § 10–307 are not adopted under the Assimilative Crimes Act and could not be considered a redefinition of the offenses. *See, United States v. Rowe,* 599 F.2d 1319 (1979).

Accordingly, the Fourth Circuit's interpretation of the law in *Kay* is not binding in interpreting Maryland law and its relationship to the Assimilative Crimes Act. To construe Maryland law in the same fashion would be an unwarranted fiction.[6] The Maryland presumptions do not constitute a redefinition of the offenses of driving while intoxicated or while under the influence. In fact, they are not even true presumptions. They are merely evidentiary in nature and

---

**6.** The Court also notes, for whatever worth it may be, that the Court in *Kay* indicated that the Virginia statutory provisions in question were enacted for the benefit of the accused; however, it is the position of the Maryland Court of Appeals that the statutes at issue here were primarily concerned with the protection of the public rather than being enacted for the protection of an accused. *See, State v. Moon, supra,* 291 Md. at p. 477, 436 A.2d at p. 427.

**918**

permit the trier of fact to draw certain permissible inferences, which inferences the trier of fact may accept or reject; and otherwise, give them whatever weight the trier of fact may deem appropriate along with all of the other evidence under consideration. They are thus not adopted by the Assimilative Crimes Act.

■ As the Court has concluded that the Maryland presumptions are not to be considered at the trial of the case, and that nothing has been presented to the Court thus far that would preclude the admissibility of the test result, the test result would ordinarily have no relevance unless its significance was otherwise explained. Regrettably, Congress has not seen fit to establish permissible inferences that could be utilized in all Federal prosecutions for offenses involving the driving of a motor vehicle and the consumption of an alcoholic beverage either within the special territorial jurisdiction of the United States or within other areas under the charge and control of the Government. *See, United States v. Dreos, supra,* 156 F.Supp. at p. 207 (legislative jurisdiction not required). In addition, under the commerce clause, Congress has the power to enact a national law prohibiting driving while intoxicated and related offenses for the entire county which could also include the appropriate presumptions and/or inferences to be applied *See,* 18 U.S.C. §§ 342, 343 and 49 U.S.C. § 31310.[7] Because of the national drunk driving problem, in this Court's opinion, it would not be inappropriate to set a national standard which would be binding upon the states.

Under the Assimilative Crimes Act, the Government adopts the laws of the various states of the union, and as a result, there is no uniformity in the various offenses involving driving a motor vehicle and the consumption of alcohol within federal enclaves. Even though one of the major reasons for enacting the Assimilative Crimes Act was to obtain uniformity of treatment for acts committed by individuals within a particular state and individuals who commit the same act within a Federal enclave of that state,

Congress should act promptly to set a uniform standard for all offenses involving driving a motor vehicle and the consumption of alcohol for all Federal property whether under the Assimilative Crimes Act or otherwise. Congress passed the Federal Implied Consent Law, but more needs to be done.

Since Congress has not set a standard, and since the Court has determined that the Maryland presumptions do not apply, in order for the test result to have any relevance, expert testimony would usually be required. Accordingly, if the Government intends to utilize the test result at trial, the significance of the test result would ordinarily need to be explained by an expert witness; such as, a physician or toxicologist. Should the Government choose not to call an expert witness, the test result would be inadmissible at trial unless some other valid legal theory supports its admissibility.

Depending upon the particular jurisdiction involved, the presumptions and/or inferences that may be drawn from a particular blood or breath alcohol level may be sufficient to convict an individual beyond a reasonable doubt of driving while intoxicated or under the influence even though there may not be any other evidence or only slight evidence of intoxication or alcohol impairment. The test result can supply in some instances, in and of itself, one of the essential elements of the offense.

Except for the *per se* offense, the Maryland legislature has not defined either "under the influence of alcohol" or "intoxication." The Court of Special Appeals in *Brooks v. State,* 41 Md.App. 123, 126–29, 395 A.2d 1224, 1226–28 (1979) addressed "impairment by alcohol" under a prior statute and not "under the influence of alcohol." The Court stated, however, that these phrases are synonymous and relied primarily upon cases from other jurisdictions that interpreted "under the influence" statutes. In *Alston v. Forsythe,* 226 Md. 121, 132, 172 A.2d 474, 479 (1961), a civil action alleging negligence, the Court of Appeals quoting from *Clay v. State,* 211 Md. 577, 584, 128 A.2d 634, 638 (1957) apparently referring to "under the influence of alcohol" appears to have approved the following defi-

7. An operator of a commercial vehicle is deemed to be driving under the influence of alcohol if the individual's blood alcohol concentration level is at or above .04 percent.

nition of driving while under the influence of alcohol,

"drinking to the extent of probably affecting one's judgment and discretion or probably affecting one's nervous system to the extent that there is a failure of normal coordination, although not amounting to intoxication."

See, Maryland Criminal Pattern Jury Instructions–Cr. 4:10, p. 171 (1991).

In Maryland, the offense of driving while under the influence of alcohol is a lesser included offense of driving while intoxicated. The offenses differ only in degree. In other states, especially where the offenses are not divided into a lesser and greater offense, the terms driving while intoxicated and driving while under the influence of alcohol may be synonymous. In states in which the offenses are divided by degree, the greater offense may be known as driving while intoxicated or driving while under the influence of alcohol, and the lesser offense may be known as driving while under the influence of alcohol or driving while impaired by the consumption of alcohol.

In construing the Maryland cases, this Court has defined driving while intoxicated as driving a motor vehicle when an individual's normal judgment, perception, and/or coordination was substantially, adversely affected; that is, made worse, to a significant degree by the consumption of an alcoholic beverage, and has defined driving under the influence of alcohol as driving a motor vehicle when an individual's normal judgment, perception, and/or coordination was adversely affected; that is, made worse to any extent by the consumption of an alcoholic beverage.

With these definitions in mind, it is noteworthy that the Supreme Court and the Fourth Circuit have recognized that a breathalyzer test is the most reliable evidence of whether an individual is intoxicated and is less intrusive than a blood test. In Mackey v. Montrym, 443 U.S. 1, 19, 99 S.Ct. 2612, 2621, 61 L.Ed.2d 321 (1979), the Court stated:

"[A] breath analysis test ... provides the most reliable form of evidence of intoxication for use in subsequent proceedings."

See also, Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 625, 109 S.Ct. 1402, 1417–18, 103 L.Ed.2d 639 (1989). In United States v. Reid, supra, 929 F.2d at p. 994, the Court recognized that:

The crime of DWI presents a unique situation in that the most reliable evidence of whether a person is driving while "legally drunk" is contained in that person's body. The best means of obtaining evidence of the breath alcohol content, and the least intrusive way of testing, is the breathalyzer test.

In light of the reliability of the test, is it necessary in this day and age, based upon the current state of knowledge, to require the test result to be interpreted by an expert witness or statutory inference? Of course, any judge-formulated presumption or inference must comply with standards of due process and satisfy the appropriate definition of intoxication and/or under the influence of alcohol.

The reasoning of the statutory-inference cases is applicable to an analysis of common-law inferences as well as judge-formulated inferences of less antiquity as the same reasoning applies. They are based upon common sense, experience, the massing of evidence, and the force of circumstances. See, Barnes v. United States, 412 U.S. 837, 844–847, 93 S.Ct. 2357, 2362–2364, 37 L.Ed.2d 380 (1973), Turner v. United States, 396 U.S. 398, 416, n. 35, 90 S.Ct. 642, 652, n. 35, 24 L.Ed.2d 610 (1970). On the other hand, one of the key distinctions between a statutory-inference and a common-law or judge-formulated inference is in the exercise of discretion. Statutory-inferences are ordinarily mandated by some legislative body; whereas, common-law or judge-formulated inferences are only invoked in the discretion of the trial judge, and as such discretion is inherent in the latter situation, fewer constitutional problems exist. Barnes v. United States, supra, 412 U.S. at p. 845 n. 8, 93 S.Ct. at p. 2363 n. 8.

In order for an inference to be constitutional, there must be a "rationale connection" between the basic facts proved by the prosecution and the ultimate fact presumed; that is, the "latter is more likely than not to flow from the former." However, in some circumstances the inference to be drawn from the basic facts proved must satisfy the reason-

able doubt standard. *Ulster County Court v. Allen,* 442 U.S. 140, 165, 99 S.Ct. 2213, 2228–2229, 60 L.Ed.2d 777 (1979), *Barnes v. United States, supra,* 412 U.S. at p. 846, 93 S.Ct. at p. 2363, *Turner v. United States, supra,* 396 U.S. at p. 416, 90 S.Ct. at p. 652. In *Ulster,* the Court stated:

Respondents' argument again overlooks the distinction between a permissive presumption [or inference] on which the prosecution is entitled to rely as one not necessarily sufficient part of its proof and a mandatory presumption [or inference] which the jury must accept even if it is the sole evidence of an element of the offense. In the latter situation, since the prosecution bears the burden of establishing guilt, it may not rest its case entirely on a presumption [or inference] unless the fact proved is sufficient to support the inference of guilt beyond a reasonable doubt. But in the former situation, the prosecution may rely on all of the evidence in the record to meet the reasonable-doubt standard before it may be permitted to play any part in a trial than there is to require that degree of probative force for other relevant evidence before it may be admitted. As long as it is clear that the presumption [or inference] is not the sole and sufficient basis for a finding of guilt, it need only satisfy the [rationale connection] test described in *Leary [Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) ].

Id. at pp. 166–167, 99 S.Ct. at pp. 2229–2230.

In deciding cases judges and juries draw inferences all of the time in the process of fact finding. As indicated above, inferences are drawn based upon common sense, experience, the massing of evidence and the force of circumstances. Ordinarily the trier of fact is free to draw their conclusions without the necessity of a statutory presumption or inference or without the necessity of a common law or judge-formulated inference. On the other hand, where the inference is one that arises from scientific evidence, the trier of fact ordinarily would not be in a position to draw any conclusions from the scientific evidence based upon common sense or experience. Accordingly, in this situation a judge-formulated inference is most appropriate in the exercise of the Court's discretion and would also be the proper subject of jury instructions at a trial by jury if the conclusions to be drawn may be judicially noticed.

The Supreme Court has stated that firmly established scientific principles are properly the subject of judicial notice under Fed.Rule Evid. 201. *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579, 592 n. 11, 113 S.Ct. 2786, 2796 n. 11, 125 L.Ed.2d 469 (1993). Under Evid.Rule 201 a judicially noticed fact is one that is not subject to reasonable dispute and is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed.Rule Evid. 201(b).

In determining whether judicial notice should be taken, the Court may consider federal and state statutes and regulations, municipal ordinances, government reports, agency rules and regulations, Surgeon General's Reports, medical and scientific reports and journals as well as various other sources which the Court is of the opinion are reliable. See, *Clemmons v. Bohannon,* 918 F.2d 858, 865–868 (10th Cir.1990) *vacated on other grounds, on reh. en banc,* 956 F.2d 1523 (10th Cir.1992).

McCormick states:

Thus it is that while the various propositions of science are a suitable topic of judicial notice, the content of what will actually be noticed is subject to change as the tenets of science evolve. It is manifest, moreover, that the principle involved need not be commonly known in order to be judicially noticed; it suffices if the principle is accepted as a valid one in the appropriate scientific community. In determining the intellectual viability of the proposition, of course, the judge is free to consult any sources that he thinks are reliable. . . . In the increasingly important practice of judicial notice of scientific and technological facts, some of the possibilities of error are, first, that the courts may fail to employ the doctrine of judicial notice in this field to the full measure of its usefulness; second, that they may mistakenly accept as authoritative scientific theories that are outmoded or are not yet received by the specialists as completely verified; and third, that in taking judicial notice of

accepted scientific facts, the courts, in particular cases may misconceive the conclusions or applications which are supposed to flow from them. Of these, it seems that the first has thus far been the most frequent shortcoming.

John W. Strong, *McCormick on Evidence*, § 330, at 394–395 (4th ed.1992).

In *St. Lewis v. Firestone*, 130 A.2d 317, 320 (D.C.Mun.App.1957), the Court stated:

> Assuming the admissibility of the record, the evidence has no probative value. No attempt was made by the appellee through expert or medical testimony to define or establish the scientific meaning of 0.27 percent or its effect on the decedent and courts cannot take judicial notice of such meaning or effect. Judicial notice may be taken only of such scientific facts known to all men of ordinary intelligence or such facts as are recognized by statute.

Nevertheless, the Court in *Poulnot v. District of Columbia*, 608 A.2d 134 (D.C.App. 1992) relying upon *St. Lewis v. Firestone* in deciding that judicial notice should not be taken in connection with a different but somewhat related issue to that involved in *St. Lewis* noted in footnote 13 of its opinion that:

> It bears noting in connection with the *St. Lewis* decision, however, that "the content of what will actually be [judicially] noticed is subject to change as the tenets of science evolve." 2 *McCormick, supra.* § 330, at 394 & n. 16.

*See also, Turner v. United States, supra.* 396 U.S. at p. 416 n. 28, 90 S.Ct. at p. 652 n. 28 and *Clemmons v. Bohannon, supra,* 918 F.2d at 865.

There appears to be a dearth of decisions discussing the precise issue involved herein. Counsel have not cited any cases specifically on point, and the Court's research has not been enlightening.

In *Reyes v. Vantage S.S. Co., Inc.,* 609 F.2d 140, n. 1 (5th Cir.1980), an admiralty case, the Court stated:

> It is undisputed that the alcohol content of Reyes's blood at the time of death was approximately 0.185%. Despite this evidence, it is clear that Reyes did not appear to be intoxicated. No matter what the appearance, an 0.185% alcohol reading is enough to convict a person of driving while intoxicated in almost every state in the Union. Judicial notice of state intoxication laws in connection with admiralty actions is not uncommon. E.g., *Schlichter v. Port Arthur Towing Co.,* 5 Cir.1961, 288 F.2d 801, 802–03, 1961 AMC 1164, 1167. Thus it is quite appropriate to conclude that Reyes was legally drunk at the time of death.

*Accord, Thier v. Lykes Bros. Inc.,* 900 F.Supp. 864, 878–879 (S.D.Texas 1995). In addition, the following statement appears in *VanHaverbeke v. Bernhard,* 654 F.Supp. 255, 257 (S.D.Ohio 1986).

> A blood alcohol test, performed approximately two hours after the accident showed the driver, Bernhard, had a blood alcohol level of .18 percent. Exh. A to Doc. # 20 at 12. Under Ohio law, a person with .10 percent blood alcohol or more is illegally driving while intoxicated. See O.R.C. § 4511.19(A)(1). This Court can take judicial notice of the fact that a person who has a blood alcohol level of .18, two hours after an incident, has an even higher blood alcohol content at the time of the incident.

The court has considered the authorities cited by counsel for the parties and has reviewed most of the reports and reference materials referred to by them as well as additional reports and reference materials. Based upon its review, the Court has concluded that:

1. Virtually all individuals are intoxicated at a blood or breath alcohol concentration level of .10.

2. Virtually all individuals are under the influence of alcohol at a blood or breath alcohol concentration level of .08.

3. The majority of individuals are impaired to some extent in their mental and/or physical abilities at a blood or breath alcohol concentration level of .05.

Without going into specific details of all of the matters considered by the Court, the following excerpts, for the most part, summarize the basis for the Court's conclusions.

> The decision to adopt presumptive and per se BAC limits is based on scientific evidence regarding alcohol's impairment of

driving ability and its role in automobile accidents. This evidence comes from two independent sources. The first is epidemiology, or the statistics correlating accident incidence with the driver's BAC. The second source is the data derived from clinical studies of individuals in which their ability to think, judge, and act appropriately is measured at various BACs. The evidence from epidemiology and from examination of individuals under controlled situations yields the same general conclusions regarding the effect of BAC on motor vehicle operation:

.    .    .    .    .

Literature on the subject dating from the 1980s (much of it an evaluation of prior studies) has suggested that alcohol impairment may occur at very low BACs and that there may not be a threshold level below which a driver should be considered unimpaired. Based on such studies, the American College of Emergency Physicians has endorsed lowering the legal limits for BAC, suggesting that a BAC of 0.05% be considered presumptive evidence of intoxication and that a BAC of 0.08% be considered illegal per se for operation of a motor vehicle. *The American Medical Association has recommended adoption of a 0.05% per se statute.* These positions are consistent with evidence of impairment in many individuals at BACs between 0.05% and 0.10% and the increase in crash frequency and responsibility for crashes as BACs increase from 0.05%. (Emphasis Added)

NHTSA has also issued a report to Congress evaluating the evidence relating BAC to impairment and risk of motor vehicle accidents, with the goal of suggesting BAC limits for drivers. The NHTSA report evaluates two types of evidence relating BAC to driver impairment. The first type concerns studies of the effects of alcohol on human performance, including laboratory tests on specific skills assumed to be related to driving and to simulated or closed course driving tests. The second type correlates accident frequency and/or accident responsibility with BAC, from which data is obtained relating BAC with accident risk. From studies of the first type, the author of the NHTSA report concluded that impairment had been shown at very low BACs and, as BAC increased, the effects of alcohol became more pronounced and were exhibited by a greater percentage of subjects. Similar results were obtained from evaluating crash statistics. The author concluded:

> There is no question that there is strong evidence that all groups of drivers appear to have higher estimated relative risk at BACs of 0.08 and above. While the evidence for increased crash risk for all drivers at very low BACs is not as strong as it is at higher BACs, it appears clear that all drivers, when compared to similar drivers at zero BAC, show increasing risk as BAC increases.

Based on both types of evidence considered, the author of the NHTSA report concluded:

> There is no threshold for alcohol impairment. Any amount of alcohol can impair performance of some people on some tasks that are related to driving. The greater the amount of alcohol, the greater the degree of impairment on a given task and the more functions (or different type of tasks) that are impaired.... Although impairment and crash risk increase much more dramatically above 0.08, there is no BAC below which alcohol is not expected to impair driving ability to some degree. While precise quantification is not possible, it is clear that the greater the alcohol [concentration in the blood], the greater the danger, and that a reduction in driver BACs will result in a significant highway safety benefit.

Richard E. Erwin, Esq., *Defense of Drunk Driving Cases,* §§ 14.02[1]–14.02[2] at 14–11—14–14 (August 1996)

The repeated performance of a particular task in association with alcohol consumption can lead to the development of a form of adaption referred to as "learned" or "behavioral" tolerance. Learned tolerance can reduce the alcohol-induced impairment that would ordinarily accompany the performance of that particular task. However, when conditions change or when something unexpected occurs, the toler-

ance acquired for that task can be negated.

These findings may be applicable to the performance of tasks involved in drinking and driving. A driver who has developed behavioral tolerance to driving a familiar car over a particular route under routine circumstances may drive without being involved in a crash, despite consumption of some alcohol. However, when encountering a novel environment—for example, a detour—or an unexpected situation, such as a bicycle darting in front of the car, this same driver would be at the same risk for a crash as a novice driver at the same BAC, due to lack of prior learning opportunities for these unexpected events.

U.S. Department of Health and Human Services, National Institute on Alcohol Abuse and Alcoholism, *Alcohol Alert,* No. 31 PH362 at p. 2 (January 1996)

Although the lack of obvious impairment or, alternatively, a demonstration that the subject was able to perform tasks in a sober manner may be used as evidence to rebut a BAC test result, it does not necessarily follow that a subject must be visibly intoxicated before the ability to drive safely is impaired. The ability to drive safely is related to, among other things, judgment, the ability to perceive and process information accurately and rapidly, and the ability to respond appropriately to complex or unfamiliar situations. Deterioration of these abilities occurs at lower BACs than those which typically cause muscular incoordination.

*Defense of Drunk Driving Cases, supra,* § 14.01 p. 14–4—14–5.

The many skills involved in driving are not all impaired at the same BAC's. For example, a driver's ability to divide attention between two or more sources of visual information can be impaired by BAC's of 0.02 percent or lower. However, it is not until BAC's of 0.05 percent or more are reached that impairment occurs consistently in eye movements, glare resistance, visual perception, reaction time, certain types of steering tasks, information processing, and other aspects of psychomotor performance.

*Alcohol Alert, supra,* p. 1.

Some statutes defining the offense of driving under the influence (DUI) typically set a blood-alcohol concentration (BAC) at which one is *presumed* to be impaired or under the influence of alcohol. Most jurisdictions have adopted per se and/or administrative per se statutes under which the offense is *defined* in terms of a specific BAC, often 0.10%. In these jurisdictions, the DUI offense consists of operating a vehicle on a public way while having a BAC of 0.10% or more; it is not necessary to document impairment in order for a violation to be found.... Some jurisdictions have adopted the lower per se limit of 0.08%. The National Highway Traffic Safety Administration (NHTSA) has recommended to Congress that a national per se limit of 0.08% be encouraged and that the availability of federal highway funds be conditioned upon a state's adoption of this limit. A number of European countries also have adopted levels of 0.08% or less.

*Defense of Drunk Driving Cases, supra* § 1402 p. 14–5—14–6.

The alcohol concentration levels set by Congress, government agencies, the National Committee on Uniform Traffic Laws and Ordinances as well as the fifty states were given substantial weight by the Court in arriving at its conclusions.[8]

---

**8.** In addition to the alcohol concentration levels otherwise mentioned herein, the Court notes that the level set by the National Park Service, Department of the Interior is .10 for the offense of driving while under the influence of alcohol unless state law sets a lower level. 36 C.F.R. § 4.23. The level set by Congress under 18 U.S.C. § 342 for driving while under the influence of alcohol by an individual operating a common carrier is .10 as set forth by a presumption in 18 U.S.C. § 343. *See,* p. 17, *supra.* Furthermore, Congress is encouraging the states to set the level at .08 under 23 U.S.C. § 410 in order for the state to obtain certain Federal grants, and an individual exhibiting this alcohol concentration level shall be deemed to be driving while intoxicated. The Surgeon General has recommended that it be illegal for an individual to drive at a blood alcohol concentration level of .08, and that all presumptions of not being under the influence of alcohol or non-intoxication should be repealed. *Surgeon General's Workshop on Drunk Driving Proceedings,* Washington, D.C., U.S. Department of Health and Human Services (1988).

The Uniform Vehicle Code, which is a model for most states, in 1992 adopted a per se offense of .08. In addition, an alcohol concentration of .08 creates a presumption that the person was under the influence of alcohol. *Uniform Vehicle Code and Model Traffic Ordinance* §§ 11–902 and 11–903 (1992 revised edition).[9]

The alcohol level concentration set by the fifty states, the District of Columbia, and Puerto Rico is highly instructive. *See, Clemmons v. Bohannon, supra,* 918 F.2d at pp. 866–868. Attached hereto as an appendix to this opinion is a table prepared by the United States Department of Transportation, National Highway Transportation Safety Administration, *Digest of State Alcohol–Highway Safety Related Legislation* (15th Ed., current as of January 1, 1997). The table reflects that 49 jurisdictions have established per se offenses. For 36 jurisdictions the per se level is .10, and for 13 jurisdictions the per se level is .08. In addition, a number of jurisdictions, including the three jurisdictions that have not established a per se level, have established presumptive levels. Also, some jurisdictions have established two presumptive levels. Twelve jurisdictions have set the presumptive level at .10 and six have set the level at .08. Furthermore, in some instances, a level, which may be labeled either presumptive or prima facie evidence of driving under the influence or driving while impaired, has been set at .07 by three jurisdictions and at .05 by three jurisdictions.

Accordingly, from all of the information brought to the Court's attention and as a result of its own research, the Court is satisfied that its conclusions set forth herein above are inevitably correct, and, based upon the current state of knowledge, it is manifest that certain permissible inferences may be drawn and judicially noticed concerning an individual's state of sobriety based upon the alcohol concentration determined to be in the individual's blood or breath at the time of testing as a result of a valid chemical test.

Alcohol concentration is defined in terms of the weight of ethanol (Ethel alcohol) in a volume of blood or breath. In the United States the typical measure is grams of ethanol in 100 milliliters of blood or in 210 liters of breath and is reported as, for example, .10 percent or .10.

"Percent" in U.S. toxicological circles means grams per 100 milliliter; this is a weight per volume measure and does not carry the usual meaning of percentage. In this [opinion], BAC is defined as either blood alcohol concentration, stated as grams per 100 milliliters of blood or as breath alcohol concentration, stated as grams per 210 liters of breath, and is reported without a "%" sign.

The basis for the calculations are the established physiological facts that alcohol distributes itself in the total water of the body, and that it is disposed of primarily by metabolism in the liver. The procedure takes into account the amount of body water in males and females, and the range of metabolic rates to be found in the population.

*See,* United States Department of Transportation, National Highway Transportation Safety Administration, Report to Congress entitled "Driving Under the Influence: A Report to Congress on Alcohol Limits" Appendix I. (October, 1992).

What inference, if any, the Court will draw will be determined in the exercise of the

---

9. "The first Uniform Vehicle Code was drafted by the Committee on Uniformity of Laws and Regulations of the National Conference on Street and Highway Safety, an association composed of delegates appointed by the governors of 43 states and representatives of public and private organizations interested in traffic safety, which was formed at the behest of the then United States Secretary of Commerce, Herbert Hoover. Even though the National Conference on Street and Highway Safety stopped meeting in 1934, this committee has continued to meet and revise the Uniform Vehicle Code. It is now known as the National Committee on Uniform Traffic Laws and Ordinances—a non-profit organization funded from government and private donations. Traffic Laws Annotated 818, pp. 818–820 (1972)." *People v. Pomeroy,* 415 Mich. 328, 337, n. 10, 329 N.W.2d 697, 701, n. 10 (1982), Levin, J. dissenting, *rev. on rehearing* 419 Mich. 441, 355 N.W.2d 98 (1984). The Uniform Vehicle Code has been cited by the Supreme Court with approval. *See, Breithaupt v. Abram,* 352 U.S. 432, 436 n. 3, 77 S.Ct. 408, 411 n. 3, 1 L.Ed.2d 448 (1957); *Kesler v. Dept. Of Public Safety,* 369 U.S. 153, 164–165, n. 28, 82 S.Ct. 807, 814–815, n. 28, 7 L.Ed.2d 641 (1962); *Berkemer v. McCarty,* 468 U.S. 420, 437–438, n. 26, 104 S.Ct. 3138, 3148–3149, n. 26, 82 L.Ed.2d 317 (1994).

Court's discretion, the totality of all of the evidence and the specific alcohol concentration test result admitted into evidence. The Court has concluded that the appropriate permissible inferences to be drawn are the following: [10]

1. .10 or more—from this level alone it may be inferred that the defendant was both intoxicated and under the influence of alcohol. The Court is satisfied that this inference complies with the beyond a reasonable doubt standard.

2. .08 and above but less than .10—from this level alone it may be inferred that the defendant was under the influence of alcohol, and the beyond a reasonable doubt standard is satisfied. However, the beyond a reasonable doubt standard is not satisfied at this level for intoxication; so that, on the charge of driving while intoxicated, this level may be considered with all of the other evidence in the case as it satisfies the rational connection or more likely than not standard.

3. .05 and above but less than .08—from this level *alone* it may *not* be inferred that the defendant was either intoxicated or under the influence of alcohol. However, the inference to be drawn satisfies the rational connection or more likely than not standard on the charge of driving while under the influence. It may satisfy this standard on the charge of driving while intoxicated depending upon the actual test result. As to both driving while intoxicated and while under the influence, this level may be considered with all of the other evidence in the case in determining whether the charge of driving while intoxicated or while under the influence of alcohol is proven beyond a reasonable doubt. On the charge of driving while intoxicated, this level may only be considered as *some evidence* that the defendant *may possibly be* intoxicated. The Court in its discretion, depending upon the test result, may need to determine whether it may be considered on the charge of driving while intoxicated for any purpose other than the consumption of a quantity of alcohol.

4. More than .02 and above but less than .05—at this level it may be inferred that the defendant was *unlikely* intoxicated or under the influence of alcohol; however, it may be considered as evidence that the defendant consumed a quantity of alcohol as well as in determining whether guilt has been proven beyond a reasonable doubt of driving while intoxicated or driving under the influence of alcohol along with all of the other evidence in the case.

5. Any measurable amount of alcohol concentration .02 or below—at this level it may be inferred that the defendant was *not* intoxicated or under the influence of alcohol. The evidence is admissible to prove the defendant's consumption of a quantity of alcohol and may be considered with all of the other evidence in the case in determining whether guilt has been proven beyond a reasonable doubt on the charge of driving under the influence of alcohol but it may not be given any weight on the charge of driving while intoxicated; and ordinarily, it would be appropriate to grant a judgment of acquittal on the intoxication charge at this level.

■ In determining the admissibility of the test result, it will ordinarily be necessary for the test to have been administered within

---

10. The government suggests that the Court take judicial notice of the blood alcohol concentration levels set forth by the State of Maryland in Cts. & Jud.Proc. § 10–307 or by the Department of the Army in the Code of Federal Regulations. *See,* 32 C.F.R. §§ 634.1, 634.10 and 634.34. These regulations primarily relate to the administrative suspension or revocation of driving privileges on military installations. Under the regulations a blood alcohol concentration of .05 but less than .10 is presumptive evidence of impairment, and a blood alcohol concentration of .10 or more indicates intoxication.

Although the Court can take judicial notice of all state statutes and the Code of Federal Regulations generally; that is, their existence and con-

tents, the Court does not have to accept them as the legal standard to be utilized in this or future cases. The legal standard should be based upon what the Court finds to be the current state of knowledge which is beyond reasonable dispute. Unless a statute or regulation is controlling, the standards should be unitary and subject to universal application. Nevertheless, the Court recognizes that it may be difficult to draw precise and definite demarcation zones in setting the appropriate standards. For this reason the permissible inferences or standards adopted herein by the Court may be somewhat conservative as the Court is of the opinion that if any error has been made, in a criminal case, any such error should inure to the benefit of the accused.

a reasonable period of time after the defendant was driving a motor vehicle.[11] In Maryland, the test result is not admissible in evidence if the test was not administered within two hours after the accused is apprehended, Cts. & Jud.Proc. § 10–303. Under the Uniform Vehicle Code the test is to be administered within three hours of the time of driving, § 11–902. Generally, the longer the period of time the more beneficial it is to a defendant. *See, State v. Moon, supra,* 291 Md. at pp. 474–477, 436 A.2d at pp. 425–427. *See also, Van Haverbeke v. Bernhard,* 654 F.Supp. 255, 257 (S.D.Ohio 1986).

■■■■ An apprehension is analogous to taking the accused into custody or formal arrest. It ordinarily does not occur immediately upon a traffic stop. *See, Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Pennsylvania v. Bruder,* 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988). If an individual is stopped and suspected of an alcohol related driving offense, as with most traffic stops, a license, registration, and/or warrant check will be undertaken by the investigative officer. In addition, before making an apprehension or arrest, the individual will likely be requested to perform a number of field sobriety tests. An apprehension in some situations can be an elusive concept. *See, Willis v. State,* 302 Md. 363, 488 A.2d, 171 (1985). Accordingly, under most circumstances, a two hour apprehension

test would likely be substantially the same as a three hour time of driving test. The Court has concluded that a reasonable period of time will ordinarily be a test administered within three hours of the time of driving, However, a test administered beyond the three hour time limit will not necessarily preclude the admissibility of the test result or the application of the appropriate permissible inferences. This will be determined in the exercise of the Court's discretion. In addition, the Court also will have to consider in exercising its discretion whether there is any evidence that the accused may have consumed a quantity of alcohol between the time of driving and the administration of the chemical test. In some cases this may be a question of fact to be decided by the trier of fact.

Should the above case go to trial, barring unforseen developments, the trial shall be conducted in accordance with the principles set forth herein. The Court will issue a separate Order denying the defendant's Motion to Suppress Evidence but also barring the use of Maryland's evidentiary presumptions in Md.Code Ann., Cts. & Jud.Proc. § 10–307, and the Court may take Judicial Notice of the permissible inferences to be drawn as set forth herein as the appropriate legal standards to be applied depending upon the result of any chemical (breathalyzer) test admitted into evidence.

331 Md. 199, 627 A.2d 1019 (1993).

---

**11.** Under Maryland law the definition of driving includes being in actual physical control of a vehicle. Trans. II, § 11–114; *Atkinson v. State,*

APPENDIX

U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

# Digest of State Alcohol-Highway Safety Related Legislation

**Current as of January 1, 1997**

**Fifteenth Edition**

UNITED STATES COURTS LIBRARY
ROOM 303
UNITED STATES COURTHOUSE
101 WEST LOMBARD ST.
BALTIMORE, MD. 21201

928

TABLE 1

ANALYSIS BY STATES – HIGH-INTEREST LEGISLATION

| STATE | PBT | Mand. Susp/Rev-Refusal* 1st | Mand. Susp/Rev-Refusal* 2nd | Admin. Per Se Law (BAC) | Mandatory Susp/Rev-Admin. Per Se** 1st | Mandatory Susp/Rev-Admin. Per Se** 2nd | Mandatory Susp/Rev-Admin. Per Se** 3rd | Illegal Per Se (BAC) | Presumptive Level (BAC) | Open Cont. Law[13] | Anti-Consump. Law | Dram Shop[11] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL | | S-90 dys | S-1 yr | 0.08 | S-90 dys | S-1 yr | S-3 yrs | 0.08 | 0.08 | | | L |
| AK | X | R-90 dys | R-1 yr | 0.10 | R-30 dys | R-1 yr | R-3 yrs | 0.10 | 0.10 | X[16] | X[14] | L |
| AZ | X | S-12 mos | S-12 mos | 0.10 | S-30 dys | S-90 dys | S-90 dys | 0.10 | 0.10 | | X | L |
| AR | | S-6 mos | S-2 yrs | 0.10 | —[55] | S-16 mos | S-30 mos | 0.10 | — | | X | No |
| CA | X | S-1 yr[54] | R-2 yrs | 0.08[56] | S-30 dys[56] | S-1 yr[56] | S-1 yr[56] | 0.08 | 0.08 | X | X | L[16] |
| CO | X | R-1 yr[54] | R-2 yrs[54] | 0.10 | R-3 mos[57] | R-1 yr[57] | R-1 yr[57] | 0.10 | .05-.10[57] | | X | L |
| CT | | —[29] | S-1 yr | 0.10 | —[29] | S-1 yr | S-2 yrs | 0.10 | — | | | L[19] |
| DE | X | R-6 mos | R-18 mos | (.10)[3] | R-3 mos | R-1 yr | R-18 mos | 0.10 | (0.10[9]) | | X[14] | No |
| DC | X | S-12 mos | S-12 mos | (.05)[4] | — | — | — | 0.10 | (0.05[9]) | X | X | C |
| FL | X | S-90 dys | S-18 mos | 0.08 | S-30 dys | S-1 yr[54] | S-1 yr[54] | 0.08 | (0.08[9]) | X[14] | | L[23] |
| GA | | S-1 yr | S-1 yr | 0.10 | — | S-120 dys | S-2 yrs | 0.10 | 0.08 | X | X | L |
| HI | | R-1 yr | R-2 yrs | 0.08 | R-30 dys | R-1 yr | R-2 yrs | 0.08 | (0.08[10]) | X | X | C |
| ID | X | S-180 dys | S-1 yr | 0.10[4] | S-30 dys[4] | S-1 yr[4] | S-1 yr[4] | 0.10 | — | X | X | L |
| IL | | — | S-2 yrs | 0.10 | — | S-90 dys | S-90 dys | 0.10 | 0.10 | X | X | L[19] |
| IN | | S-1 yr | S-1 yr | 0.10 | S-180 dys[3] | S-180 dys[3] | S-180 dys[3] | 0.10 | 0.10[11] | X[15] | X[14] | L |
| IA | X | R-90 dys | R-1 yr | 0.10 | R-30 dys | R-1 yr | R-1 yr | 0.10 | — | X[14] | X | L |
| KS | X | S-1 yr | S-1 yr | 0.08 | S-30 dys | S-1 yr | S-1 yr | 0.08 | (0.08[9]) | X | X | No |
| KY | X | — | — | A[2] | — | — | — | 0.10 | — | | X | — |
| LA | | —[31] | —[31] | 0.10 | —[31] | —[31] | —[31] | 0.10 | 0.10 | | X | L[14] |

TABLE 1 (continued)
ANALYSIS BY STATES – HIGH-INTEREST LEGISLATION

| STATE | PBT | Mand. Susp/Rev-Refusal [16] | | Admin. Per Se Law (BAC) | Mandatory Susp/Rev-Admin. Per Se [46] | | | Illegal Per Se (BAC) | Presumptive Level (BAC) | Open Cont. Law [12] | Anti-Consump. Law | Dram Shop [13] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1st | 2nd | | 1st | 2nd | 3rd | | | | | |
| ME | | S-275 dys[2] | S-18 mos | 0.08 | -- | S-18 mos | S-4 yrs | 0.08 | -- | | X[14] | L[19] |
| MD | X | S-120 dys | S-1 yr | 0.10 | -- | S-90 dys | S-90 dys | 0.10 | (.07[4]) | X[23] | X[14] | No |
| MA | | S-120 dys[21] | S-120 dys[21] | 0.08 | S≤90 dys[20] | S≤90 dys[22] | S≤90 dys[22] | No | 0.08 | | X[14] | C |
| MI | X | -- | S-1 yr | No | -- | -- | -- | 0.10 | .07,.10[17] | X | X | L |
| MN | X | R-15 dys | R-180 dys | 0.10 | R-15 dys | R-90 dys | R-90 dys | 0.10 | -- | X | X | L |
| MS | X | S-90 dys[3] | S-90 dys[3] | 0.10[4] | -- | -- | -- | 0.10 | -- | | | L |
| MO | X | R-90 dys | R-1 yr | 0.10 | S-30 dys | R-1 yr | R-1 yr | 0.10 | -- | | X[14] | L[26] |
| MT | X | S-6 mos | R-1 yr | No | -- | -- | -- | 0.10 | (0.10[8]) | -* | -* | L |
| NE | X | R-1 yr[44] | R-1 yr[44] | 0.10 | R-30 dys | R-1 yr | R-1 yr | 0.10 | -- | X | X | No |
| NV | X | -*[8] | -*[8] | 0.10 | R-90 dys[41] | R-90 dys[41] | R-90 dys[41] | 0.10 | -- | X | X[14] | No |
| NH | X | S-180 dys | S-2 yrs | 0.08 | S-6 mos | S-2 yrs | S-2 yrs | 0.08 | (0.08[8]) | X | | L |
| NJ | | R-6 mos | R-2 yrs | No | -- | -- | -- | 0.10 | -- | | X | L |
| NM | X | R-1 yr | R-1 yr | 0.08 | R-90 dys[38] | R-1 yr[35] | R-1 yr[35] | 0.08 | -- | X | X | L |
| NY | X | R-6 mos | R-1 yr | A[7] | -- | -- | -- | 0.10 | -- | X[23] | X | L |
| NC | X | R-6 mos | R-12 mos | 0.08 | R-10 dys | R-10 dys | R-10 dys | 0.08 | (.07,.10[4]) | X[23] | X[14,15] | L[19,27] |
| ND | X | R-1 yr | R-2 yrs | 0.10 | S-30 dys | S-365 dys | S-2 yrs | 0.10 | -- | X | X | L |
| OH | X | S-30 dys | S-90 dys | 0.10 | S-15 dys | S-30 dys[46] | S-180 dys[47] | 0.10 | -- | X | X | L |
| OK | | -- | S-1 yr | 0.10 | -- | -- | -- | 0.10 | (.05,.10[4]) | X | X | C |
| OR | | S-90 dys | S-1 yr | 0.08 | S-30 dys | S-1 yr | S-1 yr | 0.08 | (0.08[2]) | X | X | L |

2 - 2

15th Edition

TABLE 1 (continued)
ANALYSIS BY STATES – HIGH-INTEREST LEGISLATION

| STATE | PBT | Mand. Susp/Rev-Refusal* | | Admin. Per Se Law (BAC) | Mandatory Susp/Rev-Admin. Per Se** | | | Illegal Per Se (BAC) | Presumptive Level (BAC) | Open Cont. Law[23] | Anti-Consump. Law | Dram Shop[13] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1st | 2nd | | 1st | 2nd | 3rd | | | | | |
| PA | X | S-12 mos | S-12 mos | No | - | - | - | 0.10 | - | | X[14] | L |
| PR | X | S-6 mos | S-1 yr | No | - | - | - | No | 0.10** | | | No |
| RI | X | S-3 mos | S-1 yr | No | - | - | - | 0.10 | - | | X[14] | L |
| SC | X | S-90 dys | S-90 dys | No | - | - | - | No | 0.10[24] | X | X | C[17,19] |
| SD | X | - | - | No | - | - | - | 0.10 | 0.10 | X | | C |
| TN | | - | - | No | - | - | - | 0.10 | .10 (.08)[25] | X[14] | X[14] | L |
| TX | | - | S-90 dys | 0.10 | - | S-90 dys | S-90 dys | 0.10 | - | | X[14] | L[22] |
| UT | X | R-1 yr | R-1 yr | 0.08 | S-90 dys | S-1 yr | S-1 yr | 0.08 | - | X | X | L[20] |
| VT | X | S-6 mos | S-18 mos | 0.08 | S-90 dys | S-18 mos | S-2 yrs | 0.08 | 0.08[26] | | X[15] | L |
| VA | X | S-1 yr | S-1 yr | 0.08 | S-7 dys | S-7 dys | S-7 dys | 0.08 | 0.08 | | X[14] | No |
| WA | | R-1 yr | R-2 yrs | 0.10 | N/A | R-2 yrs | R-2 yrs | 0.10 | - | X | X | C[18] |
| WV | X | R-90 dys[16] | R-1 yr[17] | 0.10[11] | R-30 dys[17] | R-1 yr[17] | R-1 yr[17] | 0.10 | 0.10[11] | | X | C |
| WI | X | R-30 dys | R-90 dys | 0.10[23] | - | - | - | 0.10[24] | (0.10*) | X | X | L[16] |
| WY | | S-6 mos | S-18 mos | 0.10 | - | S-90 dys | S-90 dys | 0.10 | - | | X | L[15] |
| TOTALS | 31 | S-25 R-17 | S-27 R-19 | 41 | S-16 R-11 | S-23 R-13 | S-23 R-13 | 0.10=36 0.08=13 No=3 | 0.08=6 0.10=12 | 28 | 40 | L=36 C=8 No=8 |

S = Suspension, R = Revocation, A = Alternative, L = Statutory Law, C = Case (Common) Law

*With the exception of Nevada, all of the other U.S. Jurisdictions listed in this table have a licensing sanction for a violation of the implied consent law. Except for Nevada, therefore, a blank space in these columns does not mean that a jurisdiction does not have a sanction. It only means that a jurisdiction does not have a mandatory sanction.

**A blank space in these columns for an admin. per se jurisdiction does not mean that it does not have a licensing sanction. It only means that it does not have a mandatory sanction.

15th Edition

TABLE 1 (continued)

ANALYSIS BY STATES – HIGH INTEREST LEGISLATION

[1] Preliminary Breath Test (Pre-arrest/nonevidentiary breath test) Law

[2] If the driver participates in an alcohol or drug treatment program, the mand susp period may be less than 275 dys.

[3] Based on probable cause of DWI. A BAC ≥0.10 is conclusive evidence of a DWI offense for the purposes of an admin. per se law violation.

[4] An admin. per se law violation is based on driving while under the influence of intoxicating liquor or drugs. An alcohol concentration ≥0.05 is prima facie evidence of driving while under the influence of intoxicating liquor.

[5] Suspension up to 180 days or until the DWI charge have been disposed of which ever occurs first.

[6] The administrative per se law cannot be enforced until 7/1/97.

[7] Alternative pre-DWI criminal adjudication licensing action by the courts.

[8] License suspension for one (1) year if the driver has a prior DWI offense conviction.

[9] Special provisions/procedures.

[10] Applies to persons 18 years old or above.

[11] Or under the influence of alcohol.

[12] Laws prohibiting the possession of an open container of an alcoholic beverage in the passenger compartment of a motor vehicle.

[13] Seven (7) States and Puerto Rico do not have dram shop liability.

[14] Applies only to drivers.

[15] The lower of the two numbers is evidence of driving while impaired; the higher is prima facie evidence of driving while under the influence.

[16] Applies only to the actions of intoxicated minors.

[17] The lower of the two numbers is driving while impaired; the higher is driving while under the influence.

[18] Competent evidence of DWI.

[19] This state has a statute that places a monetary limit on the amount of damages that can be awarded in dram shop liability actions.

[20] An alcohol concentration which indicate prima facie evidence of a driving while under the influence offense.

[21] There is no mandatory licensing action if the violator is allowed to participate in the ignition interlock program.

[22] Applies only to the actions of intoxicated minors or persons known to be habitually addicted to alcohol.

[23] The statue appears to have limited actions to those committed by minors.

[24] An alcohol concentration ≥0.07 but <0.10 is prima facie evidence of driving while under the influence.

[25] Limited application.

[26] Cause of action limited to licensees who have been convicted of the offense of selling alcoholic beverages either to minors or to intoxicated individuals.

[27] The statute applies specifically to the actions of intoxicated minors, but the law does not foreclose developing case law as to other types of dram shop actions.

[28] Not less than 0.08 constitutes being under the influence of intoxicating liquor.

[29] A person may receive a "special permit" based on a showing of "extreme hardship". Under proposed regulations dated 9/13/93, there would be a 30 dy mand. susp.

[30] Applies only to the actions of (1) intoxicated minors or (2) adults who have lost their will to stop drinking.

[31] This state has both prima facie and presumptive evidence laws with an alcohol concentration ≥0.10.

[32] Statutory law has limited dram shop actions.

[33] Liability limited only to the actions of persons who are under 21 years old.

[34] 90 days if the person pleads guilty to a DWI charge at the time of first arraignment with counsel.

[35] Provided there is also a 2nd or sub. DWI conviction.

[36] This alcohol concentration is an inference of DWI.

[37] Possible case law.

[38] Prima facie evidence of impairment.

[39] Applies to actions of intoxicated minors.

[40] A BAC ≥0.05 for persons who operate busses, trucks or other large motor vehicles.

[41] A DWI conviction following an admin. revocation cancels the admin. revocation action. Thereafter, the licensing sanctions for a DWI offense apply; this includes the right to obtain restricted driving privileges

[42] Provided the person participates in the ignition interlock program.

[43] For a 1st & 2nd off, an alcohol concentration ≥0.10; for a 3rd or subsequent off, an alcohol concentration ≥0.08

[44] This revocation is based on administrative action.

[45] Provided the driver has an alcohol concentration ≥0.04.

[46] Applies only if there was a prior DWI offense conviction.

[47] Applies only if there were two prior DWI offense conviction.

[48] An alcohol concentration ≥0.10 is prima facie evidence for 1st and 2nd offs. An alcohol concentration ≥0.08 is prima facie evidence for 3rd and sub. offs.

[49] The Open Container/Anti-Consumption law appears to be limited to persons who are operating "common carriers".

[50] Applies only to persons ≥21 years old.

[51] Suspension for 180 days if the driver has had a previous drunk driving offense conviction. Suspension for 1 year if the driver has had two or more previous drunk driving offense convictions.

[52] Suspension until the drunk driving charges are disposed of but not more than 90 days.

[53] For a 1st offense, an alcohol concentration ≥0.10 is a presumption of driving while under the influence of an intoxicant. For a subsequent offense, an alcohol concentration ≥0.08 is a presumption of driving while under the influence of an intoxicant.

[54] This 1 year suspension only applies if there have been two or more drunk driving offense convictions. The "actual" suspension period appears to be only 11 months.

[55] A restricted hardship license may be issued for a 1st violation.

[56] The mandatory revocation periods for 1st and 2nd refusals may be reduced to respectively 3 mos and 6 mos if the driver participates in the ignition interlock program.

[57] The mandatory revocation periods for 1st and subsequent admin. per se violations may be reduced respectively to 1 mo and 3 mos if the driver participates in the ignition interlock program.